IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ROGER E. HERST REVOCABLE
TRUST, *et al.*,

    *Plaintiffs*,

    v.

BLINDS TO GO (U.S.) INC., *et al.*,

    *Defendants*.

Civil Action No. ELH-10-3226

## AMENDED MEMORANDUM OF DECISION

Plaintiffs, Roger E. Herst Revocable Trust; Dr. Roger E. Herst, Trustee of the Roger E. Herst Revocable Trust; and Joshua R. Herst, filed suit in the Fall of 2010 against Blinds to Go (U.S.) Inc. and Blinds to Go Inc. (collectively, "BTG" or "Tenant").[1]  As to Blinds to Go (U.S.) Inc., plaintiffs alleged in Count I that defendant breached a commercial lease agreement (the "Lease" or the "BTG Lease"), dated September 21, 2000, for real property located at 5525 Urbana Pike, in Frederick, Maryland (the "Property").  The Lease had a fifteen-year term, and BTG utilized the Property as a retail store.  In Count II, plaintiffs claimed that Blinds to Go Inc., the Canadian parent company of Blinds to Go (U.S.) Inc., breached its Guaranty of Lease, also dated September 21, 2000 (the "Guaranty").  Defendants concede that they breached both the Lease and the Guaranty when the Tenant abandoned the Property.  However, they dispute plaintiffs' claim for damages.

The case was tried to the Court, without a jury, on October 3 and 4, 2011.  The Court issued its original Memorandum of Decision, including findings of fact and conclusions of law, in compliance with Rule 52(a) of the Federal Rules of Civil Procedure, on October 26, 2011.

---

[1] Suit was filed in the Circuit Court for Frederick County, Maryland.  BTG removed the case to federal court on the basis of diversity jurisdiction.  *See* 28 U.S.C. §§ 1332(a), 1441.

The Court now issues this Amended Memorandum of Decision, to correct an error in the calculation of damages.[2]  See ECF 53, 59.

**Factual Background**

At trial, plaintiffs presented the testimony of Dr. Roger Herst, plaintiff; Lee Engle and Jeffrey Banks of StreetSense Retail Advisors, LLC; and Scott Manhoff.  Defendants presented the testimony of Lynda Tanguay, BTG's Director of Legal Affairs; and Rory S. Coakley.  Mr. Manhoff was received as an expert witness in the field of commercial real estate and leasing, and Mr. Coakley was received as an expert in commercial leasing and management.  Mr. Engle and Mr. Banks testified as hybrid fact/expert witnesses; Mr. Engle and Mr. Banks both worked for the company hired by Dr. Herst to relet the Property after the breach, and both testified as experts in commercial real estate and leasing.  The parties introduced numerous exhibits and stipulated to several facts, some of which were memorialized in the Revised Pretrial Order (ECF 42).  The following findings of fact are drawn from the evidence presented at trial.

A.  The Property and the BTG Lease

The Property is a free-standing building consisting of approximately 3,500 square feet. *See* Plaintiffs' Exhibits 45A – 45R (photos depicting the premises).  It is located in the Riverview Plaza shopping mall, which contains several other retail establishments, including some large "box" or anchor stores, such as Home Depot.

On or about September 21, 2000, Crest Net Lease, Inc. ("Crest Net"), as the landlord, and Blinds to Go (U.S.) Inc., as the tenant, executed the Lease (Plaintiffs' Exhibit 1).  On the same date, Blinds to Go Inc. executed the Guaranty.  On August 21, 2001, Crest Net assigned its rights under the Lease and the Guaranty to plaintiffs, who became the fee owners of the Property

---

[2]  Both the original Memorandum of Decision and this Amended Memorandum of Decision were prepared without the benefit of a trial transcript.

(hereinafter, plaintiffs are sometimes referred to collectively as "Landlord").[3]   *See* Plaintiffs'

Exhibit 3.  The validity of the Lease, the Guaranty, and the assignment are undisputed.

Although the Lease was dated September 21, 2000, its "effective date" (also

characterized as the "Commencement Date") is defined as the "date upon which escrow is

deemed closed pursuant to [a] certain Purchase Agreement and Escrow Instructions" executed

contemporaneously with the Lease.  BTG Lease § 3.1.[4]  But, the term of the Lease and the rental

obligation are based on the "Rent Commencement Date."  It is defined to occur on the earlier of

180 days after the Commencement Date or upon the issuance of a certificate of occupancy for

the Property, but in no event later than July 29, 2001.  *See* BTG Lease § 4.2.  The parties agree

that the Rent Commencement Date under the Lease occurred on July 29, 2001.

The "Primary Term" of the Lease is defined as a term expiring on the last day of the

month fifteen years after the Rent Commencement Date.  *See* BTG Lease § 3.1.[5]  Thus, the

fifteen-year Primary Term expires on July 31, 2016.  The Lease also contains three options to

extend the term by five years each.  *See* BTG Lease §§ 3.2 – 3.4.

Under the Lease, Tenant was obligated to pay monthly rent on the "first day of each

calendar month" following the Rent Commencement Date.  *See* BTG Lease § 4.2.  Thus,

defendants' rent obligation began on August 1, 2001.  Moreover, the monthly rent was scheduled

to increase on an "Adjustment Date" set for the first day of the month following each five-year

anniversary of the Rent Commencement Date.  *See* BTG Lease § 5.1.1.  The amount of this

---

[3] Plaintiffs do not own any of the other properties located in the Riverview Plaza.

[4] The "Purchase Agreement and Escrow Instructions" were not placed in evidence, and the parties did not make the Court aware of the actual Commencement Date of the Lease. However, neither the term of the Lease nor the onset of Tenant's rental obligation was directly dependent upon the Commencement Date.

[5] The Lease specified that the Primary Term would run from the date that a certificate of occupancy was issued, if that date was later than the Rent Commencement Date. But, it does not appear that that eventuality occurred.

increase was to be calculated via a formula based, in part, upon the Consumer Price Index, as published by the Bureau of Labor Statistics, United States Department of Labor.  *See* BTG Lease §§ 5.1 & 5.1.3.[6]  The parties agree that the amount of the monthly rent at the time of BTG's breach (which occurred during the second five years of the Primary Term) was $8,428.33.  It is also undisputed that, as of the rental payment due on August 1, 2011 (the ten-year Adjustment Date under the Lease), the Tenant's monthly rental obligation increased to $9,271.16.

The Lease is "triple net," meaning that the Landlord was not obligated to make any payments in connection with expenses associated with the Property.  Rather, the Tenant was responsible for payment of all utilities, taxes, maintenance, and repair of the Property.  As a result, the entire amount of rent was "net" to the Landlord.  *See* BTG Lease § 4.1.

Section 17.3 of the Lease provides for a "Late Charge" of 3% of the monthly rent on any occasion that the rent was not paid when due.  Three percent of the $8,428.33 monthly rent in effect at the time of defendants' breach amounts to a late charge of $252.85 for each month in which the rent was not timely paid.  "In addition to the late charge," the Lease makes explicit that Tenant would incur interest on "any and all rent or other charges which Tenant is obligated to pay to Landlord."  *Id.*  In particular, the Lease states that any "amount not paid by one party to the other when due to the other party will bear interest from the date due" at a rate equal to the prime commercial rate being charged by Bank of America N.A. on the date due, plus 2% per annum.  BTG Lease § 17.6.  The parties stipulated that, throughout the relevant period, the applicable interest rate charged by Bank of America has been 3.25%.  Thus, they agree that the contractual rate of interest under the Lease is 5.25% per annum for purposes of this case.  With

---

[6] The original amount of the monthly rent was calculated according to a formula based on the "Total Investment" by the original landlord, Crest Net, as defined in a "Development Agreement" that is not contained in the record.  *See* BTG Lease § 4.2.

respect to the interest rate, § 17.3 of the Lease specifically provides that "Landlord and Tenant agree that this sum is reasonable to compensate Landlord for the loss of the use of funds."

The Lease contains a choice of law provision, which states: "This Lease shall be construed and enforced in accordance with the laws of the state in which the Premises are located."  BTG Lease § 28.8.  Accordingly, the Lease is governed by Maryland law.

The Lease also contains several detailed provisions concerning the rights of the parties in the event of Tenant's default.  I will address those provisions in the discussion, *infra*.

### B.  Breach of the BTG Lease

On or about August 31, 2009, BTG abandoned and vacated the premises, in breach of the Lease.  By letter dated September 1, 2009 (Plaintiffs' Exhibit 4), BTG notified plaintiffs of the decision to vacate.  The letter was signed by Lynda Tanguay on behalf of Stephen Shiller, the president of Blinds to Go (U.S.) Inc.  In the letter, BTG advised that, effective immediately, it would "cease paying any and all rent and additional rent otherwise payable under the lease, including, without limitation, utility costs, service costs and/or fees payable under maintenance contracts applicable to the Store."  Ms. Tanguay explained that the action was part of an overall business restructuring plan, in which BTG had determined that it was necessary to close the Riverview Plaza store, as well as several others across the United States and Canada.[7]  She also observed that "the rental rate currently paid by Blinds To Go under the Lease is well below the rates being paid by tenants of similar properties under new leases in the market area in which the store is located."  Therefore, she suggested that it is in "the parties' best interests to terminate the Lease (and the obligations of the parties thereunder) and permit Landlord to directly recover the entirety of such excess rent."  For this reason, Ms. Tanguay maintained that "the Landlord will not suffer any damages."  Defendants enclosed the keys to the Property with the letter.

---

[7] Ms. Tanguay testified that, since 2009, BTG has closed approximately 25 stores.

Since the date that BTG vacated (August 31, 2009), defendants have not satisfied any of their financial obligations under the Lease.  Ms. Tanguay conceded in her testimony that BTG breached the Lease by failing to pay rent after August 2009.

By letter of September 2, 2009, Dr. Herst responded to Ms. Tanguay.  *See* Plaintiffs' Exhibit 5.  He stated:  "This is to notify Blinds to Go that the Owners fully reject the unilateral termination set forth in your letter of September 1, 2009 of your lease for store 315 in Frederick, Maryland."  Further, he stated:  "The Owners will hold Blinds to Go responsible for payment of all rent and expenses as described in the lease through February 2, 2016."[8]

### C.  Procurement of Replacement Tenant

Promptly after receipt of Ms. Tanguay's letter, Dr. Herst inspected the Property and, on September 15, 2009, he executed an Exclusive Leasing/Sales Agreement (Plaintiff's Exhibit 6) with StreetSense Retail Advisors, LLC ("StreetSense"), by which StreetSense would act as plaintiffs' agent in procuring a new tenant for the Property.  Pursuant to Exhibit A of the Exclusive Leasing/Sales Agreement, plaintiffs agreed to pay StreetSense a commission, to be "split equally" between StreetSense and the "cooperating broker" representing the new tenant.  Plaintiffs agreed that the total amount of the commission would be "equal to Five Percent (5%) of the total value of the minimum guaranteed rental price . . . for the Initial Lease Term not to exclude ten (10) years."  The evidence indicated that, at that time, StreetSense's standard commission rate was at least 6%, but Dr. Herst convinced StreetSense to accept the lower rate of 5%, by which the two opposing brokers would each receive a commission equal to 2.5% of the total rent anticipated during the initial term of the new tenant's lease.

---

[8] At trial, Dr. Herst explained that, at the time he wrote the letter, he had miscalculated the expiration date of the Lease term.  There was no dispute at trial that the initial term of the Lease actually extends until the end of July 2016, and that the monthly rent under the Lease was scheduled to increase beginning in August 2011.

In the Fall of 2009, Dr. Herst and StreetSense explored a number of potential tenants for the Property.  In particular, Mr. Engle of StreetSense testified that he contacted Ryan Wilner, an agent with the real estate brokerage firm KLNB, to determine whether any of KLNB's clients would be interested in the Property.  Among KLNB's clients was Vitamin Shoppe Industries, Inc. ("Vitamin Shoppe"), a national retailer of vitamins and nutritional supplements.

According to Ms. Tanguay, BTG was also attempting to procure a replacement tenant for the Property.  She testified that she corresponded with Corey Bialow ("Mr. Bialow") of Bialow Real Estate, LLC ("Bialow"), who had worked as a real estate agent for BTG in the past, and advised him that the Property was available for lease.  She asked him to contact Dr. Herst if any of Bialow's clients were interested.  Vitamin Shoppe was also one of Bialow's clients.

It is not entirely clear from the evidence (and I need not resolve) whether Bialow or KLNB was primarily responsible for kindling Vitamin Shoppe's interest in the Property; it is clear that both Bialow and KLNB became involved in the transaction on behalf of Vitamin Shoppe.  On November 30, 2009, an officer of Bialow, acting on behalf of Vitamin Shoppe, sent a letter of intent to Wilner of KLNB, *see* Defendants' Exhibit 1, expressing Vitamin Shoppe's interest in the Property and outlining the terms on which Vitamin Shoppe would agree to lease it. Notably, the letter of intent stated that it was "anticipated that delivery of the premises will occur on or about January 3, 2011."  Defendant's Exhibit 1, at 2.  The letter of intent ultimately was transmitted to Dr. Herst, who countersigned it on December 7, 2009.  Thereafter, plaintiffs and Vitamin Shoppe proceeded to negotiate the terms of a lease.

On or about August 3, 2010, plaintiffs and Vitamin Shoppe executed a lease agreement for the Property (the "Vitamin Lease," Plaintiffs' Exhibit 7).[9]  The initial term of the Vitamin

---

[9] The provisions of the Vitamin Lease with respect to the duration of the lease term, the monthly rental rate, the build-out period, and the tenant improvement allowance were all

Lease was ten years, beginning on the Commencement Date, with two options to renew for subsequent five-year terms.  The Vitamin Lease provides, in paragraph D of the Preamble, for a "Projected Delivery Date" no earlier than September 1, 2010.  Under paragraph F of the Preamble, the "Commencement Date" was set at 90 days after the Delivery Date, or on the date when Vitamin Shoppe opened for business to the public, whichever occurred earlier.  The parties' experts described this maximum-90-day period as a "build-out" period.  Both parties' experts agreed that such a period is common in the leasing of retail property.  During the build-out period, Vitamin Shoppe was not obligated to pay rent.[10]

Paragraph I of the Preamble establishes the "Fixed Rent" as $126,000 per year, payable in monthly installments of $10,500, for the first five years of the term; and $138,600 per year for the second five years of the term, payable in monthly installments of $11,550.

Under paragraph P of the Preamble, the Vitamin Lease provides for a "tenant improvement allowance of $87,500."  However, rather than requiring plaintiffs to pay $87,500 directly to Vitamin Shoppe, Section 2.05 of the Vitamin Lease established that the tenant improvement allowance would be disbursed "in the form of a credit reduction to be applied towards Fixed Rent due and payable . . . to reimburse Tenant for certain of the actual, out-of-pocket costs . . . incurred by Tenant in connection with Tenant's Work."  The tenant improvement allowance of $87,500 was worth 8 ⅓ months of Vitamin Shoppe's rent at the initial rate of $10,500 per month.  Thus, the parties agree that the tenant improvement allowance permitted Vitamin Shoppe to occupy the Property for 8 ⅓ months after the Commencement Date, before it had to pay rent to plaintiffs.

---

consistent with terms that Vitamin Shoppe originally proposed in its letter of intent.  These terms are discussed in more detail, *infra*.

[10] Indeed, BTG enjoyed a similar 180-day build-out period between the Commencement Date and the Rent Commencement Date under the BTG Lease.

In contrast to the BTG Lease, the Vitamin Lease was not a "triple net" lease. Article 5 of the Vitamin Lease obligates Landlord to pay all real estate taxes applicable to the Property, and Landlord is also required to pay the cost of repair and maintenance of the Property under Article 12 of the Vitamin Lease, except for certain specific maintenance obligations that Vitamin Shoppe assumed. Under Article 8, Vitamin Shoppe is responsible for payment for utilities.

Nevertheless, Article 5 of the Vitamin Lease requires Vitamin Shoppe to reimburse the Landlord for the "Tenant's Pro Rata Share" of all "Real Estate Taxes" that accrue during the real estate tax fiscal year, in equal monthly installments. *See* Vitamin Lease, art. 5B-E. In turn, the Vitamin Lease defines the "Tenant's Pro Rata Share" as 100%. *See id.*, Preamble, Paragraph J. Dr. Herst testified at trial, and the bank statements entered into evidence reflect, *see* Plaintiffs' Exhibit 46, that Vitamin Shoppe has paid its monthly real estate obligation to the Landlord.

The evidence showed, and the parties agree, that the Delivery Date of the Vitamin Lease actually occurred on September 1, 2010, as projected, and that the lease's Commencement Date was December 1, 2010. Thus, based on the tenant improvement allowance and the build-out period, Vitamin Shoppe did not pay any rent to plaintiffs until August 2011, when it made its first rental payment in the amount of $7,000, representing ⅔ of its monthly rental obligation. Vitamin Shoppe paid the full monthly rent of $10,500 for September 2011.[11] Pursuant to the Vitamin Lease, Vitamin Shoppe's monthly rental obligation will increase to $11,550 as of the payment due on December 1, 2015, which is five years after the Commencement Date. The initial ten-year term of the Vitamin Lease will expire on November 30, 2020.

Notably, although Dr. Herst agreed, at the outset of the search for a replacement tenant, to pay a broker's commission of 5% of the anticipated rent for the initial term of the lease, two

---

[11] Trial began on Monday, October 3, 2011, which was the first business day in October 2011, and presumably was the date when Vitamin Shoppe's October rent would have been paid. There was no testimony that Vitamin Shoppe failed to pay its rent for October 2011.

subsequent developments affected the amount of the commission that plaintiffs ultimately paid. First, the involvement of both KLNB and Bialow as brokers for Vitamin Shoppe resulted in an increase in the percentage rate of the brokers' commission.  Second, Dr. Herst negotiated with the brokers regarding the effect on the amount of the commission of the tenant improvement allowance and the "build-out" period.

As noted, with respect to the percentage rate of the commission, Dr. Herst had originally agreed to pay a commission of 5%, with the understanding that StreetSense and the tenant's broker would share equally the 5% payment.  However, the testimony of Dr. Herst and Messrs. Engle and Banks of StreetSense indicated that KLNB and Bialow, Vitamin Shoppe's brokers, were unwilling to split the 2.5% commission allocated to the tenant's broker.  Moreover, StreetSense was unwilling to accept any less than 2.5% for its own efforts.  Accordingly, Dr. Herst orally agreed to increase the commission to 6.5%, with 2.5% to be paid to StreetSense and the remaining 4% to be split between Vitamin Shoppe's two brokers.

With respect to the tenant improvement allowance and the build-out period, Dr. Herst argued to the brokers that because he would not actually receive rent from Vitamin Shoppe until after the expiration of the 90-day build-out period and the 8-⅓-month period covered by the tenant improvement allowance, the commission should be reduced.  In Dr. Herst's view, the build-out period and the tenant improvement allowance amounted to Vitamin Shoppe receiving 11 ⅓ months of "free rent."  Thus, for purposes of calculating the 6.5% brokers' commission, Dr. Herst asked the brokers to "back out" or deduct 11 ⅓ months from the total rent to be received over the ten-year term.   The brokers were unwilling to do so, but agreed instead, as a "compromise," in Mr. Engle's words, to deduct seven months of rent.[12]

---

[12] According to Mr. Engle, the seven-month figure was arrived at by summing the three-month build-out period with four more months, representing approximately half of the tenant

According to Dr. Herst and Mr. Engle, the end result of the two changes to the calculation of the commission was that Dr. Herst and the brokers ultimately agreed to calculate the commission based on 6.5% of the total amount of rent to be received over the ten-year initial term of the Vitamin Lease, less seven months' worth of rent. The evidence showed that Dr. Herst, in fact, paid a commission totaling $81,218 to StreetSense, in two equal installments. It is apparent that the amount of $81,218 was derived in the following manner, consistent with the agreement between plaintiffs and the brokers:

| | | |
|---|---|---:|
| $126,000 (annual Vitamin Shoppe rent in 1st 5 yrs.) × 5 yrs | = | $630,000 |
| $138,600 (annual Vitamin Shoppe rent in 2nd 5 yrs.) × 5 yrs | = | + $693,000 |
| Total Ten Year Rental Income | = | $1,323,000 |
| Less 7 months × $10,500 (initial monthly rental rate) | = | − $73,500 |
| | | $1,249,500 |
| | | × 6.5% |
| Total Commission (rounded to nearest dollar)[13] | = | **$81,218** |

Additional facts will be included in the discussion.

### Discussion

As noted, defendants concede that they breached the Lease and the Guaranty. Indeed, the parties agree as to many of the underlying facts, although they disagree as to the amount of plaintiffs' damages. The resolution of their disputes turns on the legal interpretation of the BTG Lease, and the reasonableness, recoverability, and accuracy, *vel non*, of certain items of damages

---

improvement allowance period. Notably, Mr. Engle was of the view that Dr. Herst's request to deduct the build-out period was "atypical." Plaintiffs' expert, Mr. Manhoff, also agreed that it made little sense to "back out" the build-out period from the total rent, because the build-out period was "not commissionable" in the first place. In other words, because Vitamin Shoppe's ten-year rental obligation did not begin until after the conclusion of the build-out period, rent for the build-out period would never have been included in the commission calculation in any event.

[13] The result of the calculation is actually $81,217.50. Notably, the invoices Dr. Herst received from StreetSense specified a "Commission Factor" of "2.75," rather than the 2.5% that Dr. Herst and Mr. Engle testified StreetSense was to receive. Mr. Engle could not explain the 2.75 figure as anything other than a misprint, and it is apparent that a 2.75% figure was not used in the calculation of the actual amount paid by plaintiffs.

sought by plaintiffs.  Because the Lease is governed by Maryland law, I will begin with a brief review of Maryland law regarding leases of commercial property, as well as the provisions of the BTG Lease that govern the parties' remedies in the event of a breach.  I will then turn to the particular areas of dispute.

### A.  Maryland Law Regarding Commercial Leases

Under Maryland law, "a lease is both a contract and a conveyance of a leasehold estate in land."  *Circuit City Stores, Inc. v. Rockville Pike Joint Venture Ltd. P'ship*, 376 Md. 331, 355, 829 A.2d 976, 989 (2003).   As such, a lease "creates between the parties both privity of contract and privity of estate, and . . . as a result, 'the obligations which the parties bear to each other may arise out of contract or from the real covenants of the leasehold estate, or sometimes from both.'" *Id.* (quoting *Arthur Treacher's Fish & Chips of Fairfax, Inc. v. Chillum Terrace Ltd. P'ship*, 272 Md. 720, 727, 327 A.2d 282, 286 (1974)).

In *Circuit City*, the Maryland Court of Appeals reviewed the traditional common law doctrines, deriving from property law, governing a landlord's options when a tenant breached a lease, and discussed the trend, particularly in commercial leasing, toward the use of contractual provisions to augment or supplant the parties' rights at common law.  With respect to the common law, the court explained, *id.* at 353, 829 A.2d at 988-89:

> At common law, a landlord had three options when a tenant abandoned a commercial lease prior to its expiration.  One was to accept a surrender of the lease and thereby terminate the tenancy.  The RESTATEMENT (SECOND) OF PROPERTY § 12.1 notes that an abandonment of the premises may be treated as an offer by the tenant to surrender the lease, which the landlord may accept by reentering the premises for the landlord's own benefit.  If the landlord, expressly or by its conduct, accepts the implied offer and effects a surrender, the tenancy is terminated and the tenant's obligation to pay further rent is also terminated.  The landlord may, as a second option, reenter the premises for the account of the tenant, attempt to re-let the property for the tenant's benefit, and hold the tenant liable for any rent that had accrued at the time of the reentry as well as any future deficiency if the premises were unable to be re-let or were re-let at a lower rent

than was reserved under the lease.  Finally, under the traditional common law rule, the landlord could do nothing and hold the tenant liable for the entire amount of rent payable during the remaining term of the lease.[14]

With respect to the landlord's first option, to accept a tenant's surrender of the lease, the *Circuit City* Court observed that "the landlord becomes free of the tenancy and may again deal with the property unfettered by it," but "the tenant's obligation to pay rent ceases."  *Id.* at 354, 829 A.2d at 989.  The court recounted, *id.* at 354-55, 829 A.2d at 989-90 (internal citations omitted):

> To gain the advantage of a surrender but avoid that consequence [of termination of the tenant's monthly rent obligation], landlords began to insert in leases provisions . . . making the tenant liable for the amounts of rent reserved in the lease, notwithstanding any entry or termination by the landlord upon the tenant's default, and to rely on contract law, rather than property law, for the enforcement of that obligation.  That, in turn, rests on the proposition . . . that a lease is both a contract and a conveyance of a leasehold estate in land . . . .
>
> The inclusion of such a provision often shifts the focus away from whether a completed surrender occurred, because, even if it did, the tenant may remain liable for the amount of rent reserved in the lease as a matter of contract law.  The difference is that the claim is not for the post-surrender rent itself which, under property law, is no longer owed, but for damages arising from breach of the contract.
>
> In either case, whether seeking to recover rent under property covenants on the theory that a surrender has not occurred or to recover contract damages under contract law, the landlord has its own obligation to mitigate damages.  We have recognized generally that, when one party breaches a contract, the other party is required by the "avoidable consequences" rule of damages to make all reasonable efforts to minimize the loss sustained from the breach and can charge the defaulting party only with such damages as, "with reasonable endeavors and expense and without risk of additional substantial loss or injury, he could not

---

[14] The *Circuit City* Court noted that this third common law option, for the landlord to "do nothing and hold the tenant liable for the entire amount of rent," has been statutorily abrogated for residential leases in Maryland, and that the "[m]ore contemporary common law has sought to achieve the same result with respect to commercial leases."  *Id.* at 353, 829 A.2d at 989.  In other words, "'under the modern rule [a] landlord may not remain idle when the tenant abandons the premises without legal excuse for so doing.  He must make an effort to mitigate his damages as a condition of recovery against the tenant, in this case by endeavoring to relet.'"  *Id.* (quoting 2 MILTON R. FRIEDMAN, FRIEDMAN ON LEASES § 16.3, at 1084 (4th ed. 1997)).

prevent." That principle applies as well to damages resulting from a tenant's abandonment of leased premises.

With this background, I turn to consider the provisions of the Lease regarding Tenant's default, and will address additional legal points in the context of the disputed issues.

## B.  Default Provisions of the BTG Lease

The Lease, a comprehensive agreement, sets forth in Section 17.2 the Landlord's remedies in the event of a default by the Tenant.  Several provisions are triggered by the Tenant's default.  Section 17.2 recites: "Landlord shall have any one or more of the following remedies after the occurrence of a default by Tenant.  These remedies are not exclusive; they are cumulative in addition to any remedies now or later allowed by law, in equity, or otherwise[.]" In addition, Section 17.2.6 states:

> Pursuit of any of the [Landlord's] remedies [set forth in Section 17.2] does not constitute an irrevocable election of remedies nor preclude pursuit of any other remedy provided elsewhere in this Lease or by applicable law, and none is exclusive of another unless so provided in this Lease or by applicable law. Likewise, forbearance by Landlord to enforce one or more of the remedies available to it on an Event of Default does not constitute a waiver of that default or of the right to exercise that remedy later or of any rent, damages, or other amounts due to Landlord hereunder.

Landlord's various remedies are set forth in Section 17.2.1 through 17.2.5.  First, Section 17.2.1 permits Landlord to "[t]erminate this Lease by giving written notice of termination to Tenant, in which event Tenant immediately shall surrender the Premises to Landlord."  Section 17.2.1 also authorizes Landlord to "re-enter and take possession of the Premises and expel or remove Tenant and any other person occupying the Premises" if Tenant fails to surrender the Property upon written notice of termination.

However, Section 17.2.2 provides that "[*n*]*o act by Landlord other than giving notice of termination to Tenant shall terminate this Lease*."  (Emphasis added.)  By way of example, the

section provides: "Acts of maintenance, efforts to relet the Premises, or the appointment of a receiver on Landlord's initiative to protect Landlord's interest under this Lease shall not constitute a termination of this Lease."

The evidence demonstrated that plaintiffs never transmitted written notice of termination to defendants. To the contrary, plaintiffs strenuously insisted on several occasions that they rejected BTG's unilateral attempt to terminate the Lease. Nevertheless, the Landlord's remedies upon termination, which are enumerated in the balance of Section 17.2.2, remain relevant. Section 17.2.2 states:

> On termination of the Lease, Landlord shall have the right to recover from Tenant:
>
> (i)     The worth at the time of the award of the unpaid rent that had been earned at the time of termination of this Lease; and
>
> (ii)    The worth at the time of the award of the amount by which the unpaid rent that would have been earned after the date of termination of this Lease until the time of award exceeds the amount of the loss of rent that Tenant proves reasonably could have been avoided; and
>
> (iii)   The worth at the time of the award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of the loss of rent that Tenant proves reasonably could have been avoided; and
>
> (iv)    Any other amount, including, without limitation, reasonable attorneys' fees and court costs, necessary to compensate Landlord for all detriment proximately caused by Tenant's default.
>
> The phrase "worth at the time of the award" as used in clauses (i) and (ii) above is to be computed by allowing interest at the rate of twelve percent (12%) per annum, but not to exceed the then legal rate of interest. The same phrase as used in clause (iii) above is to be computed by discounting the amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of the award, plus one percent (1%).
>
> The term "rent" as used in this Section 17.2.2 means all sums payable by Tenant pursuant to the Lease, including, without limitation, all rent, additional rent, Taxes, and insurance.

Section 17.2.3 of the Lease provides that "Landlord may re-enter and take possession of the Premises without terminating this lease," and that "Landlord may relet the premises, or any part of them, to third parties, but has no obligation to do so."  With respect to reletting, Section 17.2.3 states: "Landlord may relet the Premises on whatever terms and conditions Landlord, in its sole discretion, deems advisable.  Reletting can be for a period shorter or longer than the remaining term of this Lease."  The section also reiterates: "Landlord's action under this Subsection is not considered an acceptance of Tenant's surrender of the Premises unless Landlord so notifies Tenant in writing."  The balance of Section 17.2.3 sets forth provisions related to Tenant's liability to Landlord if Landlord relets the Property, and the allocation of rent from any reletting:

> Tenant shall be immediately liable to Landlord for all costs Landlord incurs in reletting the Premises, *including brokers' commissions, expenses of remodeling the Premises required by the reletting, and like costs.* Tenant shall pay to Landlord the rent due under this Lease on the dates the rent is due, less the rent Landlord receives from any reletting.
>
> *If Landlord elects to relet the Premises without terminating this Lease, any rent received will be applied to the account of Tenant, not to exceed Tenant's total indebtedness to Landlord; no reletting by Landlord is considered to be for its own account unless Landlord has notified Tenant in writing that the Lease has been terminated.*  If Landlord elects to relet the Premises, rent that Landlord receives from reletting will be applied to the payment of: (i) first, any indebtedness from Tenant to Landlord other than rent due from Tenant; (ii) second, all costs, including maintenance, incurred by Landlord in reletting; and (iii) third, rent due and unpaid under the Lease.  After deducting the payments referred to in this Subsection, any sum remaining from the rent Landlord receives from reletting will be held by Landlord and applied in payment of future rent as rent becomes due under this Lease.  If, on the date rent is due under this Lease, the rent received from the reletting is less than the rent due on that date, Tenant will pay to Landlord, in addition to the remaining rent due, all costs, including maintenance, Landlord incurred in reletting which remain after applying the rent received from the reletting.  *Tenant shall have no right to or interest in the rent or other consideration received by Landlord from reletting to the extent it exceeds Tenant's total indebtedness to Landlord.*  (Emphasis added.)

Finally, Section 17.2.5 makes further provision for Tenant' liability to Landlord for damages under any of the foregoing provisions.[15]  It states:

> In all events, Tenant is liable for all damages of whatever kind of nature, direct or indirect, suffered by Landlord as a result of the occurrence of an Event of Default. If Tenant fails to pay Landlord in a prompt manner for the damages suffered, Landlord may pursue a monetary recovery from Tenant.  Included among these damages are all expenses incurred by Landlord in repossessing the Premises (including, but not limited to, increased insurance premiums resulting from Tenant's vacancy), all expenses incurred by Landlord in reletting the Premises (including, but not limited to, those incurred for advertisements, brokerage fees, repairs, remodeling, and replacements), all concessions granted to a new tenant on a reletting, all losses incurred by Landlord as a result of Tenant's default (including, but not limited to, any unamortized commissions paid in connection with this Lease), a reasonable allowance for Landlord's administrative costs attributable to Tenant's default, and all attorneys' fees incurred by Landlord in enforcing any of Landlord's rights or remedies against Tenant.

It is plain that Section 17.2.3, which permits the Landlord to relet the premises without terminating the Lease, is applicable here.  Notably, this provision is a departure from the common law standard that otherwise would apply.  In Maryland, after a tenant's "surrender, which a tenant tenders by abandoning the premises," a landlord's "reletting beyond the original term," as occurred here when plaintiffs executed the Vitamin Lease, "is evidence of an intent to accept the surrender," although it "is not conclusive of that intent, as a matter of law, in the face of other evidence from which a contrary intent can be inferred."  *Millison v. Clarke*, 287 Md. 420, 426, 413 A.2d 198, 201 (1980).  In other words, "a reletting beyond the original term is not the acceptance of a surrender as a matter of law where there is evidence from which the trier of fact could find that the landlord did not intend that result."  *Id.* at 436, 413 A.2d at 206.  Here, the parties bargained that Landlord could relet "for a period shorter or longer than the remaining

---

[15] Section 17.2.4 of the Lease permits Landlord to "[r]e-enter the Premises without terminating this Lease . . . and do whatever Tenant is obligated to do under the terms of this Lease."  However, no party contends that this section is applicable.

term of this Lease," BTG Lease § 17.2.3, and that nothing other than written notice by the Landlord would effect termination.

Because Tenant is contractually obligated to pay rent even after acts that could be considered a termination of the Lease as a matter of real property common law, it is plain that damage principles under contract law apply here.  In particular, plaintiffs have the "obligation to mitigate damages."  *Circuit City*, *supra*, 376 Md. at 355, 829 A.2d at 990.  It is also salient that, "[i]n most contract cases, the law of compensatory damages applies, providing a standard measure of compensation limited to the amount of injury incurred under a breach of the contract."  *Willard Packaging Co. v. Javier*, 169 Md. App. 109, 122, 899 A.2d 940, 947 (2006). In *David Sloane, Inc. v. Stanley G. House & Assocs. Inc.*, 311 Md. 36, 42, 532 A.2d 694, 697 (1987), the Maryland Court of Appeals set forth the "measure of damages for breach of contract," adopting the standard stated in the RESTATEMENT (SECOND) OF CONTRACTS:

> [T]he injured party has a right to damages based on his expectation interest as measured by
>> (a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus
>> (b) any other loss, including incidental or consequential loss, caused by the breach, less
>> (c) any cost or other loss that he has avoided by not having to perform.

## C.  Areas in Dispute

Plaintiffs' claim for damages is composed of several elements.  Plaintiffs seek unpaid rent from defendants for a total of 23 ⅓ months, representing the time from defendants' breach in September 2009 until one third of the way through August 2011, when Vitamin Shoppe's tenant improvement allowance was exhausted and Vitamin Shoppe began paying rent to plaintiffs. Plaintiffs also seek late charges of 3% of the rent for each of the 23 ⅓ months of unpaid rent, and repayment of real estate taxes and utilities, for which Tenant was responsible under the BTG

Lease.  Moreover, plaintiffs contend they are entitled to recoup several other costs they incurred due to BTG's breach.  Specifically, they seek reimbursement for the brokers' commission; the cost of a title search for the Property, performed at Vitamin Shoppe's insistence; attorneys' fees incurred in negotiating the Vitamin Lease (including an unsuccessful attempt to change the zoning of the Property with respect to signage limitations);[16] and "administrative costs" incurred by Dr. Herst, in the form of compensation for his time spent managing the Property, securing the new tenant, and attending to matters connected to this litigation, at the rate of $250 per hour. Finally, plaintiffs seek prejudgment interest on all unpaid sums at the rate of 5.25% per annum, as specified in the BTG Lease.

Defendants assert a number of challenges to plaintiffs' claim for damages.  First, defendants broadly challenge the reasonableness of plaintiffs' efforts to relet the Property and thereby mitigate their losses, claiming that plaintiffs did not move expeditiously enough to execute a lease with Vitamin Shoppe, and that certain concessions plaintiffs made to Vitamin Shoppe were unreasonable.  In particular, they challenge the following: the necessity of the 90-day "build-out" period, during which no rent was due; the tenant improvement allowance, which, although calculated on the basis of Vitamin Shoppe's anticipated improvement cost per square foot of the Property, was the practical equivalent of a concession of 8 ⅓ months' "free rent"; Dr. Herst's charge for administrative costs, both in terms of the hourly rate and the total number of hours allegedly expended by Dr. Herst; the reasonableness of the 6.5% rate of the brokers' commission; and the attorneys' fees expended concerning the signage zoning issue.

---

[16] Plaintiffs also seek to recover their attorneys' fees incurred in prosecuting this litigation.  In a pretrial ruling (ECF 40), with the consent of the parties, I reserved as to the issue of counsel fees for the litigation until after the trial as to liability and damages.  Accordingly, this Memorandum of Decision does not address plaintiffs' entitlement to litigation attorneys' fees, which remains to be resolved.

Defendants also argue that the Court should amortize (or prorate) various items of damages claimed by defendants, to account for the fact that the ten-year term of the Vitamin Lease extends 52 months beyond the end of the BTG Lease.[17]  Specifically, they seek proration of the brokers' commission, the tenant improvement allowance, the attorneys' fees, and the title search.  In addition, defendants contend that they are entitled to the benefit of the difference between the rent for which they are obligated under the remainder of the Lease term and the higher rent that plaintiffs will receive from Vitamin Shoppe during that same period.  In their view, this "surplus" rent should offset their liability to plaintiffs.

Defendants do not challenge the reasonableness or necessity of the other non-litigation attorneys' fees or the tax and utility bills for which plaintiffs seek reimbursement.  But, they ask the Court to scrutinize the amounts alleged by plaintiffs for accuracy.

### 1. Unpaid Rent and Late Fees

In the Revised Pretrial Order (ECF 42), the parties stipulated that the total amount of BTG's unpaid rent for 23 ⅓ months was $196,661.03, derived by multiplying the monthly rent of $8,428.33 by 23 ⅓.  Similarly, the parties stipulated that the total amount of late charges owed by BTG for the unpaid monthly rent was $5,899.83, derived in two steps: first, a monthly 3% late fee of $252.85 was derived by taking 3% of the monthly rent of $8,428.33; then, that monthly late fee of $252.85 was multiplied by 23 ⅓.

"Under federal law, stipulations . . . are generally binding on the parties and the Court." *Brown v. Tennessee Gas Pipeline Co.*, 623 F.2d 450, 454 (6th Cir. 1980).  *See Richardson v. Director, Office of Workers' Compensation Programs*, 94 F.3d 164, 167 (4th Cir. 1996)

---

[17] Defendants use the term "amortization" to describe what they are seeking, but the more appropriate term for the concept is proration.  *Compare* BLACK'S LAW DICTIONARY 99 (9th ed. 2009) (defining "amortization" as the "act or result of gradually extinguishing a debt, such as a mortgage, usu. by contributing payments of principal each time a periodic interest payment is due") *with id.* at 1340 (defining "prorate" as to "divide, assess, or distribute proportionately").

("stipulations and admissions are binding on the parties and the court . . . at trial") (citing *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988)). "Having agreed on a set of facts, the parties [who adopted the stipulation], and th[e] Court, must be bound by them; we are not free to pick and choose at will." *Stanley Works v. FTC*, 469 F.2d 498, 506 (2d Cir.), *cert. denied*, 412 U.S. 928 (1973). However, a "district court is entitled to disregard a stipulation if to accept it would be 'manifestly unjust or if the evidence contrary to the stipulation [is] substantial.'" *PPX Enters., Inc. v. Audiofidelity, Inc.*, 746 F.2d 120, 123 (2d Cir. 1984) (quoting *Loftin and Woodard, Inc. v. United States*, 577 F.2d 1206, 1232 (5th Cir. 1978)); *see also Hoodho v. Holder*, 558 F.3d 184, 191 (2d Cir. 2009) (stating that "[a]dmissions by parties are not subject to judicial scrutiny to ensure that the admissions are fully supported by the underlying record," although the court may disregard a stipulation "[i]n rare cases" of manifest injustice or substantial contrary evidence).[18]

### 2. Delay in Executing Lease & Reasonableness of Terms

Claiming that the Landlord had a duty to mitigate, defendants complain that an

---

[18] The evidence at trial appeared inconsistent with the parties' stipulation in two respects, both pertaining to the ⅓ of a month at the end of the calculation, which represents partial rent (and a partial late fee) for the month of August 2011. First, the undisputed evidence at trial made plain that August 1, 2011, was the ten-year rent Adjustment Date of the BTG Lease. Therefore, BTG's rent for August 2011 was $9,271.16, not $8,428.33. Second, the parties' stipulation that ⅓ of the month's rent for August 2011 was unpaid appears to stem from the fact that Vitamin Shoppe's tenant improvement allowance of $87,500 represented 8 ⅓ months' worth of rent at the monthly rental rate of $10,500 per month; in August 2011, Vitamin Shoppe made its first rental payment of $7,000, representing ⅔ of Vitamin Shoppe's monthly rent. It was more than ⅔ of BTG's monthly obligation, however. In light of these discrepancies, perhaps a more appropriate method of calculating BTG's unpaid August 2011 rent would be to credit Vitamin Shoppe's payment of $7,000 against the $9,271.16 monthly rent owed by BTG, making BTG responsible for the difference of $2,271.16 (plus a late fee of $68.13, representing 3% of $2,271.16, for a total of $2,339.29), rather than the parties' stipulated partial rent of $2,809.44, *i.e.*, ⅓ of $8,428.33 (plus a late fee of $84.28, representing 3% of $2,809.44, for a total of $2,893.72). However, neither of these discrepancies presents a manifest injustice or a substantial contradiction sufficient to disregard the parties' stipulation. The bottom line difference is only about $554, which is a small sum in the context of the case.

unreasonable amount of time passed between the date that Dr. Herst signed the letter of intent (December 7, 2009), the date that the Vitamin Lease was signed (August 3, 2010), and the date of the Vitamin Lease's commencement (December 1, 2010).  Defendants point to Defendants' Exhibit 12, a letter of May 15, 2010, from Vitamin Shoppe to Robert McCarthy, Esquire, counsel for the Landlord, enclosing four originals of the proposed Vitamin Shoppe lease agreement. Defendants suggest that it took too long—from May 15 until August 3, 2010—for the execution of the Vitamin Lease.  However, the defendants did not introduce any evidence indicating whether those four execution originals were the same in content as the lease that was ultimately executed by Dr. Herst in August 2010.  In any event, even if it was the exact lease that was ultimately signed, the Vitamin Lease provided for a projected delivery date of September 1, 2010, and a commencement date ninety days later.  Neither date was contingent on the date that the lease was executed.  Put another way, even if Dr. Herst had executed the Vitamin Lease in May 2010, there is no evidence that Vitamin Shoppe's obligation to pay rent would have commenced any sooner.

To the contrary, it is clear, from the outset of the negotiations, that Vitamin Shoppe did not intend to effectuate the terms of the lease until, at the earliest, the end of 2010.  The letter of intent submitted by Bialow on behalf of Vitamin Shoppe, dated November 30, 2009 (Defendants' Exhibit 1), stated that "it is anticipated that delivery of the premises will occur on or about January 3, 2011."  In addition, testimony adduced at trial indicated that Vitamin Shoppe did not budget for the opening of a store in 2010.  Therefore, any delay in the execution of that lease is of no moment in the context of this case.

Defendants' counsel suggested in closing that Dr. Herst made too many concessions to Vitamin Shoppe to obtain the lease, and that Vitamin Shoppe essentially got everything that it

sought.  But, as the evidence indicated, Vitamin Shoppe agreed to pay rent for the first five years of the lease on the basis of $36 per square foot, in contrast to the rate that BTG had paid of $28.90 per square foot.  Mr. Coakley, the defense expert, characterized the rate of $36 per square foot as a "very good rate."  Moreover, several witnesses testified to extensive product available on the market in the Frederick area and the generally poor economic conditions that prevailed in late 2009 through 2010.  Nevertheless, the new rent paid by Vitamin Shoppe represented an increase of approximately 25% over what had been paid by BTG.  Mr. Coakley also acknowledged that a landlord has discretion in regard to the terms of the reletting of the premises, and that it is ordinary business custom to provide incentives to secure a tenant, as a cost of reletting.  Under the BTG Lease, the Landlord had no contractual obligation to seek the approval of the defaulting Tenant with respect to the terms of a lease for a replacement tenant.

Further, it is simply implausible that Dr. Herst would seek to rent the Property at less than the best rate he thought he could obtain.  Dr. Herst could not be assured that he would be able to recover his losses from BTG, as the evidence suggests that BTG was in a financially precarious position at the time of its breach.  Moreover, defendants presented no basis to conclude that the time it took to finalize the Vitamin Lease or the amount of rent to be received under it were commercially unreasonable, or otherwise violated plaintiffs' duty to mitigate.

### 3. Ninety-Day "Build-Out" Period

Defendants challenge the reasonableness of the ninety-day "build-out" period under the Vitamin Lease, between the Delivery Date (September 1, 2010) and the Commencement Date (December 1, 2010).  I see no merit in this contention.  Notably, defendants enjoyed a build-out period twice as long (180 days) under the BTG Lease.  Moreover, the expert testimony indicated that such a build-out period was routine in the context of retail commercial leasing.

### 4. Amount of the Tenant Improvement Allowance

The evidence showed that the tenant improvement allowance was calculated by the allowance of $25 per square foot multiplied by the size of the premises, 3500 square feet.  This calculation yielded a tenant improvement allowance of $87,500.  According to the defendants' expert, Mr. Coakley, the sum of $25 per square foot was on the "high side."  In his view, an allowance based on $5 to $10 a square foot would have been reasonable.

In my view, the evidence readily supported a tenant improvement allowance based on $25 per square foot.  Plaintiffs' expert, Mr. Manhoff, testified that a tenant improvement allowance is a common incentive and that the allocation of $25 per square foot was in line with market deals at the time of the transaction, as well as the present time.  He also explained that it is often configured as a rent abatement in order to enable a landlord to avoid expending a large sum at the time of the execution of the lease to cover the tenant's cost of improvements.

The amount of the tenant improvement allowance was, in my view, fair and reasonable and appropriate in view of the market conditions.  Based on custom and market conditions, it is clear that a tenant improvement allowance of $25 per square foot, amounting to $87,500, was reasonable in an effort to secure a branded, national tenant.

### 5. Dr. Herst's Administrative Costs

Paragraph 7.2.5 of the BTG Lease permits plaintiffs to recover "a reasonable allowance for Landlord's administrative costs attributable to Tenant's Default."  Although defendants concede that, pursuant to the terms of the Lease, plaintiffs are entitled to recover administrative costs attributable to their breach, they vigorously challenge the sum sought by plaintiffs.

In particular, Dr. Herst claims 152.5 hours of time devoted to this matter as a result of the Tenant's breach, and he selected a rate of $250 per hour for his time, totaling $38,125 in

administrative costs since the breach on September 1, 2009.  Plaintiffs' Exhibit 47, an itemized

log of Dr. Herst's time allegedly expended in administrating the Property since the default, was

prepared by Dr. Herst after he attempted to make a careful review of his diaries to ascertain the

time he expended.  It includes items such as driving time to inspect the Property, inspection of

the premises, working with prospective tenants, meetings with brokers, meetings with legal

counsel, and time devoted to the litigation that ensued.[19]

In his testimony, Dr. Herst explained that he is the manager of the properties that he

owns, and has managed this Property since he purchased it.  He claimed that he is qualified as a

property manager, because he holds a Master's degree in real estate from Johns Hopkins

University, and became a licensed real estate agent in the early 1980s.  Although his license has

since lapsed, he practiced as a real estate agent for some 10-12 years.[20]

Dr. Herst assigned a "value" of $250 per hour for his time based on his understanding of

what others charge.  For example, he pointed to the identical rate charged by his expert, Mr.

Manhoff.  Notably, plaintiffs communicated to defendants that Dr. Herst would charge $250 per

hour for his time as early as October 2009, in a letter from plaintiffs' counsel to defendants'

counsel.  *See* Plaintiffs' Exhibit 18, at 2.

Scott Manoff, plaintiffs' expert, recognized that the Lease does not define "administrative

costs."   In his view, it refers to efforts to get the building re-leased, legal costs, and necessary

travel time and expenses.  Moreover, he opined that Dr. Herst is entitled to compensation for the

time he expended in connection with the legal proceedings initiated to recover damages, noting

that Dr. Herst's time is as valuable as anyone else's.  In Mr. Manoff's view, the hourly rate of

---

[19] Defense counsel pointed out inconsistencies with the representations made by Dr. Herst in the affidavit submitted in support of a motion for summary judgment at an earlier juncture in the case. See ECF 20.  Dr. Herst explained the discrepancies as a mistake.

[20] Dr. Herst, who is 73 years of age, is also a novelist and a Rabbi.

$250 is "very fair," and consistent with what others charge for their time.   Nevertheless, he characterized the expenditure of 152.5 hours since September 2009 as "excessive" and "high."

I am satisfied that the hourly rate of $250 is a reasonable rate for the value of Dr. Herst's time.  However, I agree with defendants that plaintiffs are not entitled to recover payment for all 152.5 hours expended by Dr. Herst.  As defense counsel put it in closing argument, Dr. Herst was certainly in control of how he chose to spend his time.  Moreover, I have carefully reviewed Plaintiff's Exhibit 47.  Without belaboring the point, there are many expenditures of time that either appear unnecessary, given that Dr. Herst hired competent professionals to undertake some of the tasks for which he also charged, or simply seem inflated.

To illustrate, on October 23, 2009, Dr. Herst expended one hour reviewing correspondence from Allen Fox, who was then counsel for defendants.  By that point in time, he already had capable legal counsel, whose time he has also claimed.  On November 13, 2009, he spent an hour reviewing correspondence from opposing counsel.  On February 10, 2010, he spent one hour in connection with the title search.  On March 30, 2010, he spent one hour "in review" of BTG's "failure to meet deadlines."  On June 17, 2010, he charged a half hour for a visit to the zoning attorney about signage, yet that visit is not reflected on the bill submitted by the zoning attorney.  *See* Plaintiff's Exhibit 22-G.  On July 15, 2010, Dr. Herst allegedly spent three hours in "drafting and transmission of Late Payment for previous months."  Yet, the amounts of BTG's late payments were the same for every month until August 2011.  On September 22, 2010, he spent 1.5 hours in connection with redrafting the complaint, notwithstanding that he hired capable counsel to perform the legal work.  On February 28, 2011, he spent 1.5 hours reviewing federal court procedures.  And, throughout Plaintiffs' Exhibit 47, Dr. Herst did not itemize his time in less than half-hour increments.  Thus, on several occasions, Dr. Herst claimed a full half

hour to pay a bill associated with the Property.

Nevertheless, I reject defendants' apparent contention that Dr. Herst is not entitled to recover the costs of time spent in attending to matters involving this case that required the attention of a party representative, such as attending depositions (particularly his own), responding to interrogatories, and attending settlement conferences.  To be sure, it is the "'general rule'" in Maryland that "'costs and expenses of litigation, other than the usual and ordinary Court costs, are not recoverable in an action for damages,'" in the absence of a contractual provision to the contrary.  *Collier v. MD-Individual Practice Ass'n, Inc.*, 327 Md. 1, 11, 607 A.2d 537, 542 (1992) (citation omitted); *see, e.g.*, *Harry's Thrifty Tavern, Inc. v. Pitarra*, 224 Md. 56, 61-63, 166 A.2d 908, 911-12 (1961) (disallowing recovery, in a breach of contract claim, for "fees and expense incident to the incorporation" of a business, in absence of contractual provision).  In this case, however, Section 17.2.5 of the BTG Lease authorized Landlord to recover the "administrative costs attributable to Tenant's default," to the extent reasonable.  That language is sufficiently broad to encompass the value of the time Dr. Herst was required to devote to litigation by reason of defendants' default, albeit not to include duplicative payments for Dr. Herst's time in performing work that others were hired to do.

Upon careful scrutiny of Plaintiffs' Exhibit 47, I will reduce by approximately one third the number of hours for which Dr. Herst is entitled to compensation.  Therefore, I conclude that plaintiffs are entitled to reimbursement for 100 hours of administrative time, at the rate of $250 per hour, for a total of $25,000 in administrative costs.

### 6. Rate of Brokers' Commission

Section 17.2.5 of the BTG Lease makes the defaulting Tenant liable to pay "all expenses incurred by Landlord in reletting the Premises (including . . . brokerage fees . . .)."  As noted, Dr.

Herst initially agreed to pay a real estate commission of 5% for the reletting of the Property, but later agreed to increase it to 6.5%.  Any challenge to the reasonableness of that commission rate is completely without merit.  The evidence established that, at the outset, plaintiffs anticipated that only two real estate agencies would be involved: StreetSense and a tenant's broker.  Moreover, the initial commission rate of 5%, which Dr. Herst negotiated with StreetSense, was below the prevailing market rate.  When Dr. Herst later agreed to increase the rate to 6.5%, that figure was still within the prevailing norm.  And, it was completely justifiable by the fact that a third broker, Bialow, became involved in locating a new tenant for the subject premises.  Of the 6.5% total commission, 4% was allocated to the brokers acting on behalf of Vitamin Shoppe, and 2.5% was allocated to StreetSense, the Landlord's broker.

According to Dr. Herst, he essentially had no choice but to pay the increased rate of 6.5% because of the presence of the third broker, Bialow.  Vitamin Shoppe's two brokers, KLNB and Bialow, were unwilling to work for their respective one-half shares of a 2.5% commission.  And, the prospective tenant's brokers suggested that they would take the tenant to another building if Dr. Herst did not agree.  Dr. Herst was also mindful of the restrictions on the use of the building, related to the fact that it is situated in a shopping center and the use of the Property cannot compete with some of the other stores in the center, thereby limiting the range of potential tenants.  Moreover, Dr. Herst characterized the retail market in Frederick as "terrible" and "very weak."  Given the poor economy, and the number of vacancies in Frederick, coupled with restrictions on the use of the building and signage issues, Dr. Herst concluded that it was appropriate and necessary for him to agree to the increase.  Describing himself as "very aggressive" in trying to relet the premises, Dr. Herst was willing, under the circumstances, to pay a commission on the high side.

Lee Engle of StreetSense, who was involved on behalf of the Landlord as a real estate agent in reletting the premises, was received, without objection, as an expert real estate agent, specializing in commercial retailing leases.  He testified that the usual and customary rate for a real estate commission is 6%, and claimed that initially Dr. Herst was adamant in insisting on a rate below 6%.  According to Engle, the commission rate was increased because Vitamin Shoppe had another broker who refused to take less than 2%, KLNB was also unwilling to work for less than 2%, and StreetSense was not going to cut its rate below 2.5%.  Mr. Engle explained that there was a lot of "product" on the market in Frederick, the economic times were difficult, and there was a need to incentivize the brokers, particularly to secure a national tenant like Vitamin Shoppe.  For this reason, he talked to Dr. Herst about the demand for a higher commission, and Dr. Herst agreed to it.  As a result, 4% was allocated to the Landlord's two brokers and StreetSense was to be paid 2.5%.  The total commission of $81,218 was paid, in full, by Dr. Herst, pursuant to a verbal agreement by Dr. Herst to pay the higher commission rate.

Scott Manhoff also testified as an expert on behalf of plaintiffs, in the area of commercial real estate and leasing.  Mr. Manhoff has been involved in real estate as an occupation since 1988.  He is the de facto manager of the Baltimore office of Grubb & Ellis, where he is a senior Vice President.  He also owns an office building in Frederick, and has retail and industrial clients, as well as landlords, tenants, and developers. According to him, commission rates for real estate agents typically range between 6% and 8%.  In his view, the commission of 6.5% was fair and consistent with the market rate.  He explained that, in order for the owner to compensate all who were involved, there was a need to increase the commission from 5% to 6.5%.

Rory Coakley testified as an expert for the defense, in the area of commercial leasing and management.  In his view, the commission of 6.5% was a little more than normal but "not

outlandish." He acknowledged that, with three brokers involved in the transaction, it was the Landlord's decision whether to increase the commission rate from 5% to 6.5%. Moreover, he understood that there would be a concern on the part of Dr. Herst that the prospective tenant, Vitamin Shoppe, could have been shepherded elsewhere to consider another property if the commission rate was not appropriate for three separate brokers/real estate agents.

Defendants also seem to suggest that they are entitled to a reduction of the commission because they alerted Bialow to the availability of the Property, and thus were a "procuring cause" of the execution of the replacement lease. The emails between Tanguay and Mr. Bialow that were introduced in evidence indicate that defendants contacted Mr. Bialow in the hope that Bialow could find a replacement tenant. However, the same emails also indicate that BTG did not intend to involve itself in the reletting of the premises. If anything, BTG's involvement more than justified the increase in the commission rate, because a third broker was introduced into the transaction. This did not entitle defendants to a reduction in the broker's commission, however.

Based on the evidence, I readily conclude that the commission rate of 6.5% was eminently fair and reasonable.

### 7. Calculation of Brokers' Commission

It is undisputed that Dr. Herst paid a total commission of $81,218. However, the parties disagree on the underlying sum to which the commission rate of 6.5% should have been applied.

According to the evidence, the commission was to be predicated on the total anticipated rent for the ten-year term under the Vitamin Lease. However, Vitamin Shoppe and the Landlord agreed to apply the tenant improvement allowance of $87,500 as a credit against the rent obligation of Vitamin Shoppe, in lieu of having Dr. Herst tender payment to Vitamin Shoppe in the sum of $87,500 to cover the cost of improvements. As a result, although the rental obligation

of Vitamin Shoppe technically commenced on December 1, 2010, Vitamin Shoppe did not actually pay rent to Dr. Herst for the ensuing 8 ⅓ months.  In that time period, the tenant improvement allowance was applied as a credit to Vitamin Shoppe's monthly rental obligation.  In August 2011, Vitamin Shoppe paid a partial rent for that month in the sum of $7,000, representing two thirds of one month's rent.

Moreover, under the Vitamin Lease, there was no rental obligation for the period between the delivery date (September 1, 2010) and the commencement date (December 1, 2010).  Because no rent was due during that period, plaintiffs did not receive rental income for that period.  Although the evidence suggested that the three month period was "backed out" from the calculation of the brokerage commission, there was no basis to have included the build-out period in the rental calculation on which the commission was based; no money was ever intended to flow during that period.

For the period beginning on the commencement date (December 1, 2010), and ending on the last day of the fifth lease year, the expected rental income, at the rate of $10,500 per month, would yield $126,000 per year, for a five-year total of $630,000.  For the next five-year period, based on a monthly rent of $11,550, the anticipated rent would total $138,600 per year, for a total five-year rent of $693,000.  Therefore, the first five years of the Lease term were expected to generate $630,000 in rental income, and the next five years would generate $693,000, resulting in a total rental income of $1,323,000 over the entire initial term of the Vitamin Lease.

In calculating the $81,218 commission, seven months of rent were deducted or "backed out."  In other words, the rent for the ten-year term was reduced by seven months, and the commission was calculated as 6.5% of the balance.  Of the "backed out" months, three months ostensibly were for the build-out period, i.e., the period between the delivery date and the

commencement date, and the remaining four months represented approximately half of the total 8 ⅓ months of rent-free months due to the tenant improvement allowance.  It is undisputed that Dr. Herst paid the commission on this basis.

According to defendants, they are not liable for the full amount of the commission, because the calculation should not have included the rental obligation of 8 ⅓ months, as no rent was collected in that time.  However, in calculating the commission, seven months were backed out.  To be sure, only four of those months were intended to represent a portion of the 8-⅓-month "free rent" period attributable to the tenant improvement allowance.  But, the other three months were intended to "back out" rental payments that were never included in the ten-year rent.  The bottom line is that seven months were deducted from the calculation on which the commission was based.

The evidence supports the finding that a tenant improvement allowance is customary in the industry as an incentive to secure a tenant in a difficult marketplace.  And, as Lee Engle put it, the tenant improvement allowance here was "necessary to make this deal."  Moreover, he explained that the tenant was willing to take the tenant improvement allowance in the form of free rent, as opposed to requiring an up-front payment from Dr. Herst, in the amount of $87,500. He explained that it was a benefit to Dr. Herst that the new tenant was willing to take the money over time, in the form of free rent, rather than requiring him to make a large up-front payment. Further, he testified that Dr. Herst wanted StreetSense to back out the free rent-tenant improvement allowance in its entirety in calculating the real estate commission period, to reduce his obligation as to the commission.

Engle observed that, if the "deal" had been structured differently, the real estate agents would have received a commission on rent for the 8-⅓-month period.  In other words, if Dr.

Herst had paid the tenant for the tenant improvement allowance, rather than paying it by way of free rent, the commission would have been based on the rent for those 8 ⅓ months. Therefore, in his view, it was appropriate to include the phantom income in connection with the calculation of the broker's commission. Mr. Manhoff and Mr. Coakley disagreed. In their opinion, if no income was generated for that period, the brokers' commission should not include any sum of money for that period. In any event, Engle stated that StreetSense was willing to back out the 90-day build-out period and four months of the 8 ⅓ months of free rent, as a "compromise."

In my view, Dr. Herst acted reasonably in this matter. It is undisputed that he paid the commission and, under the Lease, it is an expense attributable to the breach. It is plain that, at most, 8 ⅓ months of rent should have been "backed out" of the calculation of the commission. In fact, seven months were deducted. Dr. Herst argued for a further reduction, but the brokers would not agree. Ultimately, plaintiffs made a reasonable compromise and should be compensated based on their actual expenditure. Accordingly, I will factor the full amount of the commission, $81,218, into the award of damages (subject to proration, as discussed, *infra*).

### 8. Attorneys' Fees

Plaintiffs seek to recover attorneys' fees in connection with reletting the premises. Most of those fees were charged by Robert M. McCarthy, Esquire. Defendants stipulated to the reasonableness and necessity of McCarthy's fees, and agreed to the total amount of McCarthy's fees to the extent supported by the evidence.[21] However, they dispute the necessity of $1,530 in fees paid by plaintiffs to the firm of Garson | Claxton LLC ("Claxton") for legal work performed between June 14, 2010 and June 18, 2010, in an attempt to address a zoning restriction on the

---

[21] Defendants also argue that the entire amount of the attorneys' fees (as well as several other charges) should be prorated to reflect the fact that plaintiffs' substitute tenant, Vitamin Shoppe, agreed to a lease term that extended beyond the expiration of the BTG Lease. I address that contention in a separate section, *infra*.

signage that could be erected at the Property.  Claxton charged a total of $1,530 for 3.6 hours of work, at a rate of $425 per hour, although the work did not resolve the signage issue.

In Plaintiffs' Exhibit 8, and also in testimony, plaintiffs claim a total of $5,798.68 in legal fees generated in connection with the reletting, inclusive of the $1,530 attributed to Claxton.  In support of that sum, plaintiffs introduced their Exhibits 22-A through 22-G.  Only one exhibit (22-G) pertains to Claxton.   Exhibits 22-A through 22-F reflect work performed by Mr. McCarthy between October 31, 2009 and May 31, 2010, at an hourly rate of $280.  His bills totaled $3,100.34.   In particular, Mr. McCarthy charged $280 for work through October 2009 (Ex. 22-A); $784 for work through February 2010 (Ex. 22-B); $672 for work in March 2010 (Ex. 22-C); $952 for work in April 2010 (Ex. 22-D); $216.34 for work in May 2010 (including $196 for services rendered and a UPS charge of $20.34) (Ex. 22-E); and $196 for work in June 2010 (Ex. 22-F).

When Mr. McCarthy's bills totaling $3,100.34 are coupled with the bills of $1,530.00 charged by Claxton, the total sum of legal fees amounts to $4,630.34, rather than the $5,798.68 reflected on Plaintiffs' Exhibit 8.  The discrepancy of $1,168.34 appears to have resulted from what presumably is an inadvertent double counting of Mr. McCarthy's bills dated April 30, 2010 ($952, Plaintiffs' Ex. 22-D) and May 31, 2010 ($216.34, Plaintiffs' Ex. 22-E), which total $1,168.34.  On Exhibit 8, an extra bill in the amount of $1,168.34 is listed for June 2010, but this appears to represent a "Previous Balance" (from the April and May 2010 bills, for which plaintiffs also separately accounted in Exhibit 8) that was listed on Mr. McCarthy's bill dated June 30, 2010 (Plaintiffs' Ex. 22-F).  The Court will award, as damages, the $3,100.34 in legal fees actually incurred in connection with the services of Mr. McCarthy.

As to the services of Claxton, I am satisfied that the effort to explore the signage issue was a necessary and reasonable attempt to address a concern of the prospective tenant, which would not have occurred in the absence of the defendants' default.  Although the hourly rate of $425 is not inexpensive, I am satisfied that it is not an unusual rate for a lawyer in Bethesda, Maryland.  Nor is there any dispute that Dr. Herst paid those fees.  Therefore, I will also award those legal fees to plaintiffs.[22]

Accordingly, a total amount of $4,630.34 in attorneys' fees will factor into the award.

*9. Title Search, Real Estate Taxes, Messenger Services and Utilities*

Plaintiffs also seek reimbursement for the costs of a title search performed at Vitamin Shoppe's request, fees for messenger services allegedly incurred by Dr. Herst, and real estate taxes and utility bills paid by plaintiffs while the Property was unoccupied.

With respect to the title search, which was billed to plaintiffs in the amount of $862, *see* Plaintiffs' Ex. 26, defendants suggest that there was no question of title to the Property.   To the extent that they argue this was not a reasonable cost of reletting, I disagree.  Dr. Herst explained that Vitamin Shoppe insisted on assurance that plaintiffs possessed clean title to the Property.  Agreeing to provide the replacement tenant with such assurance was within plaintiffs' discretion.

Plaintiffs claim they should recover $150 for messenger services.  However, Dr. Herst candidly testified that this sum represented nothing short of sheer speculation on his part.  Accordingly, the Court will deny plaintiffs' request to recover $150 for messenger expenses.

Defendants do not oppose plaintiffs' demand for reimbursement for real estate taxes and utilities.  But, they ask the Court to review for accuracy the bills submitted by plaintiffs.  Table

---

[22] I reject defendants' contention that plaintiffs eventually would have had to incur these fees for another tenant.  There is no indication that every prospective tenant would have shared Vitamin Shoppe's concern regarding signage.  Indeed, there was no evidence that signage was an issue for BTG.

A, attached to this Memorandum of Decision, itemizes the bills submitted into evidence by plaintiffs. In sum, the evidence showed that plaintiffs paid $9,283.87 for real estate taxes (for the period from July 2010 through June 2011); $402.05 in water and sewer charges from Frederick County; and $3,380.15 in electric bills (which includes a $250 security deposit for initiation of a new account when Tenant vacated the premises). I will, however, reduce the recovery for the amount of the electric bills by $5.96, which represents a late fee applied on the July 2010 bill, because Dr. Herst did not timely pay the bill for June 2010. Otherwise, all of the real estate taxes and utilities, in the total amount of $13,060.11, will be awarded.

*10. Proration*

At the time of BTG's breach, approximately seven years remained on the BTG Lease; it was to expire July 31, 2016. BTG vacated the premises on August 31, 2009, and ceased paying rent as of September 1, 2009. Thus, 83 months remained on the Lease at the time of the breach.

The replacement tenant, Vitamin Shoppe, signed a ten-year (*i.e.* 120-month) lease, the term of which began on December 1, 2010, and will expire November 30, 2020. Thus, Vitamin Shoppe's lease term overlaps with the remaining term of the BTG Lease for five years and eight months (*i.e.*, 68 months), and extends the rental of the Property four years and four months (*i.e.* 52 months) beyond the expiration of defendants' Lease on July 31, 2016.

According to defendants, in calculating damages, they are entitled to proration of various expenses incurred by plaintiffs in the reletting of the premises, to account for the additional 52 months of tenancy obtained by plaintiffs. In particular, defendants seek proration of the brokers' commission, the tenant improvement allowance, attorney costs, and the cost of the title search.

As support for their proration argument, defendants cite *Wilson v. Ruhl*, 277 Md. 607, 356 A.2d 544 (1976). In that case, the Maryland Court of Appeals prorated a broker's

commission, which a landlord paid to procure a replacement tenant and then sought to recover

from the defaulting tenant.  The Court stated, *id.* at 613, 356 A.2d at 548:

> The property was ultimately rented for a term of one year on 1 December 1974.
> While we regard the brokerage commission paid by [the landlord] as a necessary
> expense in mitigation, we are of the opinion that the [defaulting tenants] are liable
> for only two-thirds of that commission because the property was leased for their
> account only for the eight month period from 1 December 1974 to 31 July
> 1975 . . . .

Plaintiffs suggest that *Wilson* is inapplicable, because it concerned a residential lease.

They also argue that *Wilson* was later overruled by *Millison v. Clarke*, *supra*, 287 Md. 420, 413

A.2d 198.  Plaintiffs do not explain why the defaulting tenant's entitlement to proration should

turn on whether a lease is residential or commercial, and I view this as a distinction without a

difference.  With respect to *Millison*, that decision overruled *Wilson* on a different point.  The

*Wilson* Court suggested in *dicta* that "reletting for a term longer than the original term is so

inconsistent with the tenant's estate as to allow for no other interpretation than that the landlord

had reentered in order to accept a surrender."  *Wilson*, 277 Md. at 611, 356 A.2d at 547.  The

*Millison* Court rejected *Wilson*'s *dictum* and held that "a reletting beyond the original term is not

the acceptance of a surrender as a matter of law where there is evidence from which the trier of

fact could find that the landlord did not intend that result."  *Millison*, 287 Md. at 436, 413 A.2d at

206.  However, *Millison* did not affect the validity of the *Wilson* Court's holding with regard to

proration of a broker's commission.

Plaintiffs also point Section 17.2.3 of the BTG Lease, which requires a defaulting tenant

to "be immediately liable to Landlord for *all* costs Landlord incurs in reletting the Premises,

*including brokers' commissions*, expenses of remodeling the Premises required by the reletting,

and like costs."  (Emphasis added.)  In my view, this language clearly obligates the Tenant to pay

for the commission but, without more, does not justify disregarding the Court of Appeals's

holding in *Wilson*.   To the extent that the Landlord obtained a replacement lease term that extended beyond the term of the defaulting Tenant's lease, that cost was not "incur[red] in reletting the Premises" for the account of Tenant, within the meaning of the BTG Lease.

With respect to the broker's commission of $81,218, paid to the real estate agents, I agree that defendants are entitled to proration.   It is true that, but for the breach, plaintiffs would not have incurred this expense.   However, to the extent that plaintiffs' new lease extends beyond the term of the Lease, they will have additional revenue.   As *Wilson* teaches, it is reasonable to conclude that a portion of the commission pertains to the extended term of the new lease, *i.e.*, to the period of Vitamin Shoppe's tenancy that extends beyond the period of time for which BTG was obligated under the BTG Lease.   Notably, the amount of the commission is linked directly to the duration of the Vitamin Lease: it is calculated as a percentage of the total rent that Landlord will receive over the entire term of the lease, including both the portion of the Vitamin Lease term that overlaps with the remainder of BTG's tenancy, and the later portion of the term that does not overlap.   Given that the amount of the commission was based on the total rent over the ten-year term, it is certainly reasonable to prorate the commission, allocating solely to plaintiffs the portion of the commission applicable to Vitamin Shoppe's tenancy beyond the remaining portion of the BTG Lease term.

Therefore, the total commission of $81,218 will be reduced by 43.33%, representing a reduction allocable to the portion of the 120-month lease with Vitamin Shoppe that extends beyond the term of the BTG Lease.[23]   This correlates to the following: of the total commission of $81,218, defendants are responsible for 56.67%, or $46,023.53.

---

[23] In closing argument, defendants' counsel suggested that the appropriate reduction was 47.225%, but I am unable to discern how counsel calculated that figure.   The Court is satisfied that the appropriate reduction is 43.33%, which is equal to the number of months that the replacement tenancy extends beyond expiration of the defaulting tenant's term (in this case, 52

Nevertheless, I disagree with defendants' position that they are also entitled to the proration of the expenses for the tenant improvement allowance, attorney costs, and the title search. These costs are fixed, and were not linked by the evidence to the length of the term of the replacement lease. For example, the attorney costs incurred by plaintiffs for work performed with respect to the reletting of the premises would have been the same without regard to the length of the term of the new lease. The same applies to the title search. Moreover, there was no evidence that the amount of the tenant improvement allowance corresponded to the length of the lease term.[24] Therefore, I find no merit in defendants' request to prorate these particular costs.

### 11. Credit for "Surplus" Rent

As defendants point out, plaintiffs will receive a substantially higher monthly rent from Vitamin Shoppe than BTG was obligated to pay under the BTG Lease. For the months of September and October 2011, plaintiffs have already received two months' worth of "surplus" rent, and it is anticipated that plaintiffs will continue to receive surplus rent throughout the remainder of the BTG Lease. BTG's monthly obligation, until the expiration of the BTG Lease at the end of July 2016, is $9,271.16. In contrast, Vitamin Shoppe's monthly rent is presently $10,500 (*i.e.*, $1,228.84 more than BTG's monthly rent) and, as of December 1, 2015, that sum will increase to $11,550 (*i.e.*, $2,278.84 more than BTG's monthly obligation).

---

months), divided by the total number of months of the replacement tenant's term (in this case, 120 months). This is the same fraction applied by the *Wilson* Court.

[24] Indeed, the evidence made clear that the amount of the tenant improvement allowance was based on the square footage of the Property. Because plaintiffs did not actually expend funds to satisfy the tenant improvement allowance, but rather went without rental income for 8 ⅓ months, defendants' "payment" for the tenant improvement allowance is captured by the fact that BTG is liable for unpaid rent for those 8 ⅓ months. Accordingly, plaintiffs appropriately have not sought to recover the tenant improvement allowance, and the defendants will not be charged separately to "reimburse" plaintiffs for the tenant improvement allowance.

Accordingly, defendants argue that they are entitled to a credit against the damages they owe plaintiffs, in the amount of the surplus rent already received and the surplus that plaintiffs are expected to receive through the end of the BTG Lease term.  They cite no cases that are directly on point, but rely on *M & R Contractors & Builders, Inc. v. Michael*, 215 Md. 340, 138 A.2d 350 (1958), and a few cases from other jurisdictions, for the general proposition that gains made by a plaintiff "by reason of opportunities he would not have had but for the other party's breach, are deductible from the amount he is otherwise entitled to recover."  *Id.* at 355, 138 A2.d at 358; *see also Canady v. Crestar Mortg. Corp.*, 109 F.3d 969, 972 (4th Cir. 1997) (applying North Carolina law and stating: "In order to prevent a double recovery, courts offset any amount that mitigates damages from the damage award.").

Plaintiffs insist that defendants are not entitled to credit for any anticipated rental surplus. They, too, cite no applicable case law.  However, they suggest that the entire "surplus" would be swallowed by interest accruing on the unpaid amounts owed by defendants at the rate of 5.25%. Moreover, they argue that, although Landlord has not sent BTG written notice of termination, it could do so at any time, at which point no further rental obligation would be due from BTG (and thus, in their view, there would be no surplus).

As indicated, neither party has cited a Maryland case addressing a defaulting tenant's entitlement to the benefit of "surplus" rent received from a replacement tenant, and the Court's research has uncovered none.  However, several such cases from other jurisdictions are collected in an ALR annotation.  *See* James Timothy Payne, *Landlord and tenant: respective rights in excess rent when landlord relets at higher rent during lessee's term*, 50 A.L.R.4th 403 (1986, 2009 Supp.).

In a few of the cases cited in that annotation, courts have held that a defaulting tenant is not entitled to credit for excess rent. For instance, in *N.J. Industrial Properties, Inc. v. Y.C. & V.L., Inc.*, 495 A.2d 1320 (N.J. 1985), the New Jersey Supreme Court held that "a landlord who relets property during the unexpired period of a breaching tenant's lease, for rent in excess of that due under the original lease . . . is entitled to the excess rent," and "need not credit such excess rent against the unpaid rent owed by the defaulting tenant for the period when the property was vacant, prior to the subsequent tenant's occupancy." *Id.* at 1330. The New Jersey court reasoned: "If there is an inequity that . . . must fall on either of the parties, we have decided that it should fall on the party who breached the lease. The defaulting tenant should not get the benefit of his breach." *Id.* at 1329.

In contrast, other decisions have taken the view that a landlord is "required to credit the first tenant with the amount of the excess rent realized from a substitute tenant to whom landlord had relet the abandoned property." *Truitt v. Evangel Temple, Inc.*, 486 A.2d 1169, 1172-73 (D.C. 1984). In *Truitt*, the District of Columbia Court of Appeals reaffirmed its prior holding that, "'once a landlord does relet the abandoned premises, he can no longer hold the original tenant for the full amount of the rent, rather only for the deficiency; he must credit him with the amount received from the reletting.'" *Id.* at 1172 (citation omitted). The *Truitt* Court relied upon the compensatory purposes underlying contract damages, quoting WILLISTON ON CONTRACTS for the proposition that, "'[i]n fixing the amount of damages, the general purpose of the law is, and should be . . . to give compensation, that is, to put the plaintiff in as good a position as he would have been had the defendant kept his contract.'" *Id.* at 1173 (citation omitted). In its view, fair compensation "'involves not only assessment of gains prevented by the breach but also of losses ensuing which would not have occurred had the contract been

performed. From these must be deducted any saving to the plaintiff due to the non-performance

of the contract.'" *Id.* (citation omitted). *See also Dalamagas v. Fazzina*, 414 A.2d 494, 494

(Conn. App. 1979) ("Were we to refuse to credit the defendant with the excess rents which were

received by the plaintiffs following the defendant's breach, the plaintiffs would be in a better

position than they would have been had there been no breach."). *See also* 3 DAN B. DOBBS, LAW

OF REMEDIES § 12.15, at 359-61 (2d ed. 1993) ("DOBBS").

One notable and frequently cited case on point is *Hermitage Co. v. Levine*, 162 N.E. 97

(N.Y. 1928), an opinion authored for the New York Court of Appeals by then-Chief Judge

Benjamin Cardozo.  In that case, the court held that, in the absence of a lease provision to the

contrary, a defaulting tenant was entitled to the benefit of any excess rent realized from reletting,

but reasoned that contract damages for breach of a lease could only be "ascertained when the

term is at an end," resulting in a judgment that was "single and entire, not multiple and several."

*Id.* at 98.  In the *Hermitage* Court's view, "a damage clause can be drawn in such a way as to

make a tenant responsible for monthly deficits after the re-entry of his landlord . . . without

charging the landlord with a duty to account for a surplus in other seasons," but a "liability so

heavy may not rest upon uncertain inference." *Id.*

In this case, the parties agreed to two principal alternatives available to the Landlord if

the Tenant defaulted.  Under Section 17.2.2 of the BTG Lease, the Landlord could give the

Tenant written notice of termination.  In that scenario, the Tenant's rent obligation would cease;

however, the Landlord would be entitled to receive as damages "the worth at the time of the

award of the amount by which the unpaid rent for the balance of the term after the time of the

award exceeds the amount of the loss of rent that Tenant proves reasonably could have been

avoided."  BTG Lease § 17.2.2(ii).  The parties all agree, however, that no written notice of

termination was given.

The alternative provision, Section 17.2.3, which is applicable here, expressly authorizes the Landlord to relet the Property without terminating the Lease.  However, in that event, the parties agreed that "any rent received will be applied *to the account of Tenant*, not to exceed Tenant's *total indebtedness to Landlord*."  BTG Lease § 17.2.3 (emphasis added).  The same section also states: "Tenant shall have no right to or interest in the rent or other consideration received by Landlord from reletting *to the extent it exceeds Tenant's total indebtedness to Landlord.*"  *Id.* (emphasis added).

In *Hermitage*, Judge Cardozo held that a tenant was entitled to the benefit of surpluses from reletting, "in the absence of a provision that points with reasonable clearness to a different construction."  *Hermitage*, 162 N.E. at 98.  Here, the BTG Lease points with "reasonable clearness" in the opposite direction: it points in favor of Tenant's entitlement to the surplus.  The Lease expressly states that any rent received from a replacement tenant must be applied to Tenant's account.  Moreover, the Lease states that Tenant is not entitled to the rent received from reletting "to the extent it exceeds Tenant's total indebtedness to Landlord," which logically implies that Tenant is entitled to the benefit of excess rent up to the amount of its total indebtedness.  By its plain language, the BTG Lease contemplates that where, as here, the Landlord elected to relet the Property for the account of the defaulting Tenant, the Tenant is entitled to offset any surplus rent against its "total indebtedness" to the Landlord.

Plaintiffs' argument that the amount of any rental surplus will be offset by interest accruing on plaintiffs' debt at the contractual rate of 5.25% is both beside the point and incorrect in any event.  Even if the surplus will go entirely toward payment of interest, Tenant remains entitled to the benefit of the surplus.  Further, plaintiffs are incorrect that interest will continue to

accrue at 5.25% per annum, post-judgment, so as to swallow the surplus. The parties contractually agreed to the rate of 5.25% for pre-judgment interest. Once the Court enters judgment, however, "the underlying contract [will be] merged into final judgment and [will] cease[] to exist as an independent cause of action." *SunTrust Bank v. Goldman*, 201 Md. App. 390, ___, 29 A.3d 724, 731 (2011); *see also AccuBid Excavation, Inc . v. Kennedy Contractors, Inc.*, 188 Md. App. 214, 233, 981 A.2d 727, 738 (2009).

After entry of judgment, interest will accrue at the federal post-judgment interest rate. That rate, established by 28 U.S.C. § 1961, is "a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment," *id.* § 1961(a), and is "compounded annually." *Id.* § 1961(b).[25] *See, e.g.*, *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 633 (4th Cir. 1999) ("Federal law, rather than state law, governs the calculation of post-judgment interest in diversity cases."); *see also In re Riebesell*, 586 F.3d 782, 794 (10th Cir. 2009) ("'[P]arties may contract to, and agree upon, a post-judgment interest [rate] other than that specified in § 1961.' But to do so, they must specifically contract [using 'clear, unambiguous and unequivocal language'] around the general rule that a cause of action reduced to judgment merges into the judgment and the contractual interest rate therefore disappears for post-judgment purposes.") (internal citation omitted).

Plaintiffs also argue that, in order to give defendants the benefit of a projected future surplus, one must assume that Vitamin Shoppe will never default on its lease. They suggest that, especially in light of defendants' default, that is not a safe assumption. However, plaintiffs have

---

[25] At the time that my original Memorandum of Decision was issued, that rate was 0.12% per annum. *See* Federal Reserve Statistical Release H.15 (Selected Interest Rates) (Oct. 24, 2011), *available at* http://www.federalreserve.gov/releases/h15/20111024/h15.pdf. At the time of this writing, the rate is 0.11%. *See* Federal Reserve Statistical Release H.15 (Selected Interest Rates) (Dec. 12, 2011) *available at* http://www.federalreserve.gov/releases/h15/current/h15.pdf.

executed a comprehensive lease agreement with Vitamin Shoppe that provides ample remedies to plaintiffs in the event of the tenant's default.

Moreover, I reject plaintiffs' contention that application of the surplus to offset the amounts owed by defendants effectively deprives Landlord of its "right" to "terminate the Lease in the future." ECF 58 at 2. Plaintiffs contend: "Choosing to terminate before amassing the maximum possible future 'surplus' credit would permit Landlord to avoid such credits. But the Court's ruling precludes such right and remedy to the benefit of the defaulting party." *Id.* In essence, plaintiffs seek the opportunity to maximize their recovery by manipulating the timing of the termination of the BTG Lease. Such a result would represent an inequitable end run around Tenant's contractual right to benefit from a lease of the Property "to the account of Tenant," up to the amount of "Tenant's total indebtedness to Landlord." BTG Lease § 17.2.3. It would also violate the compensatory principle of contractual damages that "'no one shall profit more from the breach of an obligation than from its full performance.'" *Dennison v. Head Const. Co.*, 54 Md. App. 310, 322, 458 A.2d 868, 875 (citation omitted), *cert. denied*, 296 Md. 653 (1983).

I conclude that defendants are contractually entitled to benefit from the excess rents received by plaintiffs. In my view, however, determination of the appropriate amount of the excess rent to be credited to defendants cannot be based simply on subtraction of BTG's rental obligation from the rent due from Vitamin Shoppe. Rather, any credit of excess rent to defendants must be reduced to present value, because it is based on monthly surpluses that will accrue in future months.[26]

---

[26] As I see it, discounting the surplus to present value obviates the need for either party to wait until the end of the term of the BTG Lease for a unitary damages calculation to be made. *Cf. Hermitage*, *supra*, 162 N.E. 97 (holding that landlord's damages claim for unpaid rent could not be adjudicated until the end of the breaching tenant's lease term).

Discounting to present value the sums of money that are anticipated to accrue in the future is a familiar methodology.  In Maryland, discounting to present value is most commonly at issue in wrongful death and personal injury cases, in which the amounts that must be discounted to present value include the loss of the earning capacity of the decedent or the plaintiff.  *See, e.g.*, *Walston v. Sun Cab*, 267 Md. 559, 298 A.2d 391 (1973) (holding that it is reversible error in a wrongful death case to refuse to instruct the jury regarding discounting to present value, where evidence as to discounting is presented); *Lewin Realty III, Inc. v. Brooks*, 138 Md. App. 244, 287-98, 771 A.2d 446, 472-77 (2001) (holding that the trial court need not instruct jury as to discounting when party with burden of production has not introduced evidence as to discounting); *Dennis v. Blanchfield*, 48 Md. App. 325, 428 A.2d 80 (1981) (extending *Walston* to personal injury cases), *aff'd on other grounds*, 292 Md. 319, 438 A.2d 1330 (1982).

In the landlord-tenant context, discounting to present value has been endorsed by the Supreme Court, which held, in the context of a proceeding between a landlord and a tenant's trustee in bankruptcy, that "[t]he amount of the landlord's claim for the loss of his lease necessarily is the difference between the rental value of the remainder of the term and the rent reserved, *both discounted to present worth*.  This, we have said, is a method of liquidation familiar and fair."  *City Bank Farmers Trust Co. v. Irving Trust Co.*, 299 U.S. 433, 443 (1937) (emphasis added).  Other landlord-tenant cases discussing the discounting of an award of future rent or surplus rent to present value include *Jack Burton Mgmt. Co.*, 77 F. Supp. 2d, 1108-10 (E.D. Mo. 1999), and *Admae Enterprises, Ltd. v. 1000 Northern Blvd. Corp.*, 480 N.Y.S.2d 537, 537 (N.Y. App. Div. 1984).

In order to discount a future amount to present value, an appropriate discount rate must be selected.  In his treatise on remedies, Professor Dobbs explains the purpose of the discount

rate: "Reduction to present value requires a mathematical computation.  Its aim is to find and award a sum of money which, when invested safely, will suffice to pay all of the future damages as they occur by using both the award itself and the interest it earns." 2 DOBBS, § 8.5(3), at 469. In my view, the most appropriate discount rate in this case is the contractual rate of 5.25% per annum chosen by the parties.  As noted, the BTG Lease specifically provided: "Landlord and Tenant agree that this sum is reasonable to compensate Landlord for the loss of the use of funds." BTG Lease § 17.3.  There is no suggestion that this is a compound interest rate, nor does the Lease specify any compounding period.   Accordingly, I will discount based on a simple interest rate of 5.25% per annum.

In addition, I take judicial notice of  the formula for discounting to present value based on a simple interest rate, or "discount rate."  It is:

$$\text{Present Value} = \text{Future Value} \div (1 + (\text{Rate} \times \text{Time}))$$

See, e.g., SUNIL K. PARAMESWARAN, INTEREST RATES AND TIME VALUE OF MONEY 29 (2007).[27]

I have applied a reduction to present value of the projected surplus rents to be received from Vitamin Shoppe over the remaining term of the BTG Lease.  The calculation is set forth in greater detail in Table B, appended hereto.  The result of the calculation is that defendants will be entitled to a credit in the amount of $71,678.02, inclusive of the excess rent already received

---

[27] The mathematical formula for discounting to present value is a proper subject of judicial notice.  See, e.g., Russell v. City of Wildwood, 428 F.2d 1176, 1183 (3d Cir. 1970) (holding that trial judge may take judicial notice of formula for discounting to present value); Energy Capital Corp. v. United States, 47 Fed. Cl. 382, 421 (2000) ("[T]he Court can take judicial notice of the formula for calculating the present value."), aff'd in part, rev'd in part on other grounds, 302 F.3d 1314, 1330-34 (Fed. Cir. 2002) (affirming trial court's judicial notice of formula, but reversing trial court's choice of discount rate).   In contrast to the formula for a simple interest rate, the formula for discounting to present value based on a compound discount rate is: Present Value = Future Value ÷ ((1 + Rate)$^{\text{Time}}$).  See, e.g., PARAMESWARAN, supra, at 30; 2 DOBBS, § 8.5(3), at 470 n.11; 9 PAUL M. DEUTSCH & FREDERICK A. RAFFA, DAMAGES IN TORT ACTIONS, § 108.12, at 108-9 (2010).  A compound rate of interest is often assumed but, as noted, I view the parties' bargained-for contractual simple interest rate as appropriate here.

for September and October 2011 and the projected future rent for the remainder of BTG's term.

Pursuant to Section 17.2.3 of the BTG Lease, this surplus will be applied "to the payment of: (i)

first, any indebtedness from Tenant to Landlord other than rent due from Tenant; (ii) second, all

costs, including maintenance, incurred by Landlord in reletting; and (iii) third, rent due and

unpaid under the Lease."  As demonstrated, *infra*, the surplus is only sufficient to offset part of

the indebtedness in the first two categories discussed in § 17.2.3, and thus does not affect the

third category, consisting of the rent due and unpaid under the Lease.

### 12.  Prejudgment Interest

The Fourth Circuit has held that "state law applies to questions involving prejudgment

interest in diversity cases."  *United States v. Dollar Rent A Car Systems, Inc.*, 712 F.2d 938, 940

(4th Cir. 1983).  In Maryland, prejudgment interest accrues at the constitutionally established

"legal rate" of 6% simple interest per annum, *see* MD. CONST., art. III, § 57, unless otherwise

specified in the parties' contract or a superseding statute.  *See, e.g.*, *Md. Nat. Bank v. Cummins*,

322 Md. 570, 600, 588 A.2d 1205, 1219 (1991) ("Absent a contractual stipulation or a statute,

the rate of prejudgment interest may not exceed the general legal rate of six percent."); *Noyes Air

Conditioning Contractors, Inc. v. Wilson Towers Ltd. P'ship*, 122 Md. App. 283, 293, 712 A.2d

126, 131 (1998).  As noted, the BTG Lease provided for simple interest of 5.25% per annum on

any unpaid sums.  Accordingly, any interest awarded will be simple interest at the rate of 5.25%

per annum.

In *Buxton v. Buxton*, 363 Md. 634, 770 A.2d 152 (2001), the Maryland Court of Appeals

explained that there are "three basic rules governing the allowance of pre-judgment interest" in

Maryland.  *Id.* at 656, 770 A.2d at 165.  First, prejudgment interest is "allowable as a matter for

right" in cases where "'the obligation to pay and the amount due had become certain, definite,

and liquidated by a specific date prior to judgment.'"  *Id.* (citation omitted).  This category of cases in which prejudgment interest is awarded "as of course" includes cases involving "written contracts to pay money on a day certain," as well as actions for "sums payable under leases as rent."  *Id.* (citing *I.W. Berman Props. v. Porter Bros., Inc.*, 276 Md. 1, 16-17, 344 A.2d 65, 75 (1975)).  Second, prejudgment interest is not allowed "in tort cases where the recovery is for bodily harm, emotional distress, or similar intangible elements of damage not easily susceptible of precise measurement."  *Id.*  Finally, "[b]etween these poles of allowance as of right and non-allowance is a broad category of contract cases in which the allowance of pre-judgment interest is within the discretion of the trier of fact."  *Id.* at 657, 770 A.2d at 165.  However, the *Buxton* Court cautioned that, within the third category of case, it is an abuse of discretion to award prejudgment interest where the "precise damages" are "unpredictable and incapable of estimation prior to verdict."  *Id.* at 658, 770 A.2d at 166.

It is clear that the unpaid rent and unpaid late fees due under the BTG Lease fall into the first category articulated by the *Buxton* Court.  They are "sums payable under leases as rent" and have been capable of precise calculation from the date they were due.  Therefore, plaintiffs are entitled to prejudgment interest on those sums at the contractual rate of 5.25% simple interest per annum, beginning on the date due.  The interest calculation is set forth in detail in Table C, appended hereto.  The total principal amount of accrued unpaid rent and late fees is $202,560.86.  As of October 26, 2011 (the date of the original Memorandum of Decision), $12,998.20 in prejudgment interest was due and payable, and the principal has accrued and will continue to accrue daily interest at the rate of 5.25% per annum, or $29.14 per day ($202,560.86 multiplied by 5.25%, divided by 365), from October 26, 2011, until it is reduced to judgment.[28]

_____

[28] Judgment could not be entered in this case until the matter of litigation attorneys' fees was resolved, because "attorney's fees recoverable pursuant to a contract are part of the damages

The other damages, including the brokers' commission, the attorneys' fees, Dr. Herst's administrative costs, and the other various bills, could not have been determined precisely as of any date certain prior to trial of the case.  With the exception of Dr. Herst's invoice dated September 10, 2009, *see* Plaintiffs' Exhibit 21-A, which listed a $25 charge for water and sewer service, there was no evidence that plaintiffs ever billed defendants for these amounts.  Aside from the single $25 charge in Plaintiff's Exhibit 21-A, the invoices sent to defendants by Dr. Herst only included billing for the unpaid rent and late fees.  Moreover, as the foregoing discussion has indicated, plaintiffs inaccurately calculated some of these amounts.  Accordingly, as to the damages exclusive of unpaid rent and late fees, I will only award prejudgment interest running from the date of the Court's original Memorandum of Decision until entry of judgment.

Those amounts include $13,060.11 for taxes and utilities; $46,023.53 for BTG's prorated share of the brokers' commission; $4,630.34 in non-litigation attorneys' fees; $862 for the title search; and $25,000 for Dr. Herst's administrative costs.  These sums total $89,575.98.  That sum will be reduced by the credit for "surplus" rent of $71,678.02, resulting in an adjusted total of $17,897.96 in damages, exclusive of unpaid rent and late fees.  That principal amount has accrued and will continue to accrue daily interest at the rate of 5.25% simple interest per annum, or $2.57 per day ($17,897.96 multiplied by 5.25%, divided by 365), from October 26, 2011 (the date of the original Memorandum of Decision) until reduced to judgment.

### Conclusion

For the foregoing reasons, I conclude that defendants breached the Lease and Guaranty and are jointly and severally liable to plaintiffs for the principal amount of $220,458.82 (including $202,560.86 in unpaid rent and late fees, and $17,897.96 in other damages), plus

claim." *AccuBid*, *supra*, 188 Md. App. at 231; *see also SunTrust*, *supra*, 201 Md. App. at ___, 29 A.3d at 731.  As noted, the parties agreed to bifurcate the trial with regard to litigation counsel fees.

accrued prejudgment interest on unpaid rent and late fees of $12,998.20 as of October 26, 2011 (the date of the Court's original Memorandum of Decision), plus additional prejudgment interest accruing at $31.71 per day (*i.e.*, $29.14 in daily interest on unpaid rent and late fees plus $2.57 in daily interest on other damages), from October 26, 2011, until reduced to judgment.   These rulings, along with the Court's determination as to attorneys' fees, are reflected in the Order that follows.


Date:   December 20, 2011                              _____/s/_____
                                                      Ellen Lipton Hollander
                                                      United States District Judge

### TABLE A: Reimbursable Taxes and Utility Payments

| Date | Amount | For | Source (Plaintiffs' Exhibit #) |
|---|---|---|---|
| Sep 10, 2009 | $25.00 | Water/Sewer* | Ex 21-A |
| Oct 28, 2009 | $250.00 | Sec'y Dep for Electricity | Ex 25-A |
| Nov 13, 2009 | $95.59 | Water/Sewer | Ex 24-A |
| Dec 3, 2009 | $198.78 | Electricity | Ex 25-B |
| Jan 5, 2010 | $197.45 | Electricity | Ex 25-C |
| Feb 3, 2010 | $185.49 | Electricity | Ex 25-D |
| Feb 18, 2010 | $93.94 | Water/Sewer | Ex 24-B |
| Mar 4, 2010 | $153.55 | Electricity | Ex 25-E |
| Apr 6, 2010 | $203.41 | Electricity | Ex 25-F |
| May 5, 2010 | $226.02 | Electricity | Ex 25-G |
| May 10, 2010 | $93.76 | Water/Sewer | Ex 24-C |
| Jun 4, 2010 | $421.10 | Electricity** | Ex 25-I p6 |
| Jul 1, 2010 | $9,283.87 | Real Property Taxes*** | Ex 23 & Ex 25-I p11 |
| Jul 6, 2010 | $554.47 | Electricity** | Ex 25-H |
| Aug 3, 2010 | $512.57 | Electricity | Ex 25-I p3 |
| Aug 11, 2010 | $93.76 | Water/Sewer | Ex 25-I p13 |
| Sep 1, 2010 | $471.35 | Electricity | Ex 25-I p2 |
| **TOTAL:** | **$13,060.11** | | |

* Billed on an invoice from Dr. Herst to BTG - no utility bill submitted

** Plaintiffs sought to recover $981.53 for July 2010 Electricity, representing the June and July 2010 payments and a $5.96 late fee for the June 2010 balance, which evidently was paid late.  I have disallowed the late fee.

*** Real Property Taxes of $9,366.35 were charged for July 2010 - June 2011, but plaintiffs took advantage of a prepayment discount to pay only $9,283.87

### TABLE B: Adjusted Surplus Rent (Adjustment by Reduction to Present Value)

| Date | BTG Rent | Vitamin Rent | Surplus (Vitamin Rent − BTG Rent) | Surplus Reduced to Present Value* |
|---|---|---|---|---|
| Sep 2011** | $9,271.16 | $10,500 | $1,228.84 | $1,228.84 |
| Oct 2011** | $9,271.16 | $10,500 | $1,228.84 | $1,228.84 |
| Nov 2011 | $9,271.16 | $10,500 | $1,228.84 | $1,223.49 |
| Dec 2011 | $9,271.16 | $10,500 | $1,228.84 | $1,218.18 |
| Jan 2012 | $9,271.16 | $10,500 | $1,228.84 | $1,212.92 |
| Feb 2012 | $9,271.16 | $10,500 | $1,228.84 | $1,207.71 |
| Mar 2012 | $9,271.16 | $10,500 | $1,228.84 | $1,202.53 |
| Apr 2012 | $9,271.16 | $10,500 | $1,228.84 | $1,197.41 |
| May 2012 | $9,271.16 | $10,500 | $1,228.84 | $1,192.33 |
| Jun 2012 | $9,271.16 | $10,500 | $1,228.84 | $1,187.29 |
| Jul 2012 | $9,271.16 | $10,500 | $1,228.84 | $1,182.29 |
| Aug 2012 | $9,271.16 | $10,500 | $1,228.84 | $1,177.33 |
| Sep 2012 | $9,271.16 | $10,500 | $1,228.84 | $1,172.42 |
| Oct 2012 | $9,271.16 | $10,500 | $1,228.84 | $1,167.54 |
| Nov 2012 | $9,271.16 | $10,500 | $1,228.84 | $1,162.71 |
| Dec 2012 | $9,271.16 | $10,500 | $1,228.84 | $1,157.92 |
| Jan 2013 | $9,271.16 | $10,500 | $1,228.84 | $1,153.16 |
| Feb 2013 | $9,271.16 | $10,500 | $1,228.84 | $1,148.45 |
| Mar 2013 | $9,271.16 | $10,500 | $1,228.84 | $1,143.77 |
| Apr 2013 | $9,271.16 | $10,500 | $1,228.84 | $1,139.13 |
| May 2013 | $9,271.16 | $10,500 | $1,228.84 | $1,134.53 |
| Jun 2013 | $9,271.16 | $10,500 | $1,228.84 | $1,129.97 |
| Jul 2013 | $9,271.16 | $10,500 | $1,228.84 | $1,125.44 |
| Aug 2013 | $9,271.16 | $10,500 | $1,228.84 | $1,120.95 |
| Sep 2013 | $9,271.16 | $10,500 | $1,228.84 | $1,116.49 |
| Oct 2013 | $9,271.16 | $10,500 | $1,228.84 | $1,112.07 |
| Nov 2013 | $9,271.16 | $10,500 | $1,228.84 | $1,107.69 |
| Dec 2013 | $9,271.16 | $10,500 | $1,228.84 | $1,103.34 |
| Jan 2014 | $9,271.16 | $10,500 | $1,228.84 | $1,099.02 |
| Feb 2014 | $9,271.16 | $10,500 | $1,228.84 | $1,094.73 |
| Mar 2014 | $9,271.16 | $10,500 | $1,228.84 | $1,090.48 |
| Apr 2014 | $9,271.16 | $10,500 | $1,228.84 | $1,086.27 |
| May 2014 | $9,271.16 | $10,500 | $1,228.84 | $1,082.08 |
| Jun 2014 | $9,271.16 | $10,500 | $1,228.84 | $1,077.93 |
| Jul 2014 | $9,271.16 | $10,500 | $1,228.84 | $1,073.81 |
| Aug 2014 | $9,271.16 | $10,500 | $1,228.84 | $1,069.72 |
| Sep 2014 | $9,271.16 | $10,500 | $1,228.84 | $1,065.66 |
| Oct 2014 | $9,271.16 | $10,500 | $1,228.84 | $1,061.63 |
| Nov 2014 | $9,271.16 | $10,500 | $1,228.84 | $1,057.64 |
| Dec 2014 | $9,271.16 | $10,500 | $1,228.84 | $1,053.67 |
| Jan 2015 | $9,271.16 | $10,500 | $1,228.84 | $1,049.73 |
| Feb 2015 | $9,271.16 | $10,500 | $1,228.84 | $1,045.82 |

(cont'd next page)

| | | | |
|---|---|---|---|
| Mar 2015 | $9,271.16 | $10,500 | $1,228.84 | $1,041.94 |
| Apr 2015 | $9,271.16 | $10,500 | $1,228.84 | $1,038.09 |
| May 2015 | $9,271.16 | $10,500 | $1,228.84 | $1,034.27 |
| Jun 2015 | $9,271.16 | $10,500 | $1,228.84 | $1,030.47 |
| Jul 2015 | $9,271.16 | $10,500 | $1,228.84 | $1,026.71 |
| Aug 2015 | $9,271.16 | $10,500 | $1,228.84 | $1,022.97 |
| Sep 2015 | $9,271.16 | $10,500 | $1,228.84 | $1,019.26 |
| Oct 2015 | $9,271.16 | $10,500 | $1,228.84 | $1,015.57 |
| Nov 2015 | $9,271.16 | $10,500 | $1,228.84 | $1,011.91 |
| Dec 2015*** | $9,271.16 | $11,550 | $2,278.84 | $1,869.82 |
| Jan 2016 | $9,271.16 | $11,550 | $2,278.84 | $1,863.13 |
| Feb 2016 | $9,271.16 | $11,550 | $2,278.84 | $1,856.49 |
| Mar 2016 | $9,271.16 | $11,550 | $2,278.84 | $1,849.90 |
| Apr 2016 | $9,271.16 | $11,550 | $2,278.84 | $1,843.35 |
| May 2016 | $9,271.16 | $11,550 | $2,278.84 | $1,836.85 |
| Jun 2016 | $9,271.16 | $11,550 | $2,278.84 | $1,830.39 |
| Jul 2016 | $9,271.16 | $11,550 | $2,278.84 | $1,823.98 |
| **TOTALS:** | | | $80,901.56 | **$71,678.02 =Adjusted Surplus** |

\* Present Value of Monthly Surplus = Future Monthly Surplus ÷ (1 + ((0.0525 ÷ 12) × Num. of Months After Oct 2011))

\** Surplus for Sep 2011 and Oct 2011 is not reduced to present value because surplus for those months has already been received

\*** Per Vitamin Lease, Vitamin Shoppe's rent increases to $11,550 as of Dec. 1, 2015

## **TABLE C: Unpaid Rent and Late Fees with Prejudgment Interest**

| Date | Rent | Late Fee (3% of Rent) | Rent Plus Late Fee | Cumulative Rent Plus Late Fees | Interest (5.25% simple int. per annum)* | Cumulative Interest |
|---|---|---|---|---|---|---|
| Sep 2009 | $8,428.33 | $252.85 | $8,681.18 | $8,681.18 | $37.98 | $37.98 |
| Oct 2009 | $8,428.33 | $252.85 | $8,681.18 | $17,362.36 | $75.96 | $113.94 |
| Nov 2009 | $8,428.33 | $252.85 | $8,681.18 | $26,043.54 | $113.94 | $227.88 |
| Dec 2009 | $8,428.33 | $252.85 | $8,681.18 | $34,724.72 | $151.92 | $379.80 |
| Jan 2010 | $8,428.33 | $252.85 | $8,681.18 | $43,405.90 | $189.90 | $569.70 |
| Feb 2010 | $8,428.33 | $252.85 | $8,681.18 | $52,087.08 | $227.88 | $797.58 |
| Mar 2010 | $8,428.33 | $252.85 | $8,681.18 | $60,768.26 | $265.86 | $1,063.44 |
| Apr 2010 | $8,428.33 | $252.85 | $8,681.18 | $69,449.44 | $303.84 | $1,367.29 |
| May 2010 | $8,428.33 | $252.85 | $8,681.18 | $78,130.62 | $341.82 | $1,709.11 |
| Jun 2010 | $8,428.33 | $252.85 | $8,681.18 | $86,811.80 | $379.80 | $2,088.91 |
| Jul 2010 | $8,428.33 | $252.85 | $8,681.18 | $95,492.98 | $417.78 | $2,506.69 |
| Aug 2010 | $8,428.33 | $252.85 | $8,681.18 | $104,174.16 | $455.76 | $2,962.45 |
| Sep 2010 | $8,428.33 | $252.85 | $8,681.18 | $112,855.34 | $493.74 | $3,456.19 |
| Oct 2010 | $8,428.33 | $252.85 | $8,681.18 | $121,536.52 | $531.72 | $3,987.92 |
| Nov 2010 | $8,428.33 | $252.85 | $8,681.18 | $130,217.70 | $569.70 | $4,557.62 |
| Dec 2010 | $8,428.33 | $252.85 | $8,681.18 | $138,898.88 | $607.68 | $5,165.30 |
| Jan 2011 | $8,428.33 | $252.85 | $8,681.18 | $147,580.06 | $645.66 | $5,810.96 |
| Feb 2011 | $8,428.33 | $252.85 | $8,681.18 | $156,261.24 | $683.64 | $6,494.61 |
| Mar 2011 | $8,428.33 | $252.85 | $8,681.18 | $164,942.42 | $721.62 | $7,216.23 |
| Apr 2011 | $8,428.33 | $252.85 | $8,681.18 | $173,623.60 | $759.60 | $7,975.83 |
| May 2011 | $8,428.33 | $252.85 | $8,681.18 | $182,304.78 | $797.58 | $8,773.42 |
| Jun 2011 | $8,428.33 | $252.85 | $8,681.18 | $190,985.96 | $835.56 | $9,608.98 |
| Jul 2011 | $8,428.33 | $252.85 | $8,681.18 | $199,667.14 | $873.54 | $10,482.52 |
| Aug 2011** | $2,809.44 | $84.28 | $2,893.73 | $202,560.86 | $886.20 | $11,368.73 |
| Sep 2011 | ---- | ---- | ---- | $202,560.86 | $886.20 | $12,254.93 |
| Oct 2011*** | ---- | ---- | ---- | $202,560.86 | $743.27 | $12,998.20 |
| TOTALS: | $196,661.03 | $5,899.83 | $202,560.86 | | $12,998.20 | |

* Interest for each month is calculated by multiplying the Cum. Rent + Late Fees by 0.0525 ÷ 12

** Rent for August 2011 is $8,428.33 ÷ 3, pursuant to the parties' stipulation

*** Interest for October 2011 is calculated through the date of the Memorandum of Decision